2016 IL App (1st) 140158

SIXTH DIVISION
September 2, 2016

No. 1-14-0158

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| CONXALL CORPORATION, an Illinois Corporation, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant and Cross-Appellee, | ) ) | |
| v. | ) ) | No. 08 CH 15396 |
| ICONN SYSTEMS, LLC, an Illinois Limited Liability Corporation; RICHARD REGOLE; KERRY NELSON; ROBERT SMITH; MANUAL SANCHEZ; MARIO CALDERA; and JEROME VOREL, | ) ) ) ) ) | (Transferred to Law 08 L 15396) |
| Defendants-Appellees and Cross-Appellants | ) ) ) | |
| (Mine Safety Appliances Company, a Pennsylvania corporation, | ) ) ) ) | |
| Third-Party Defendant). | ) ) ) | Honorable Gregory J. Wojkowski, Judge Presiding. |

.
.

JUSTICE DELORT delivered the judgment of the court as to Parts I, II, and III, with opinion.
JUSTICE DELORT delivered the judgment of the court as to Part IV.
Presiding Justice Rochford concurred in the judgment of the court as to Parts I, II, and III, and specially concurred as to Part IV, with opinion.
Justice Hoffman concurred in the judgment of the court as to Parts I, II, and III, and dissented as to Part IV, with opinion.

**OPINION**

¶ 1 The plaintiff, Conxall Corporation, sued defendants iCONN Systems, LLC, Richard Regole, Kerry Nelson, Robert Smith, Manual Sanchez, Mario Caldera, and Jerome Vorel, alleging that they misappropriated trade secrets relating to a cable assembly and panel mount that Conxall produced and sold to third-party defendant Mine Safety Appliances (MSA). After a four-week trial, a jury returned a general verdict in favor of defendants. Conxall filed a posttrial motion for judgment *n.o.v.* and new trial, and iCONN filed a motion for attorney fees pursuant to section 5 of the Illinois Trade Secrets Act (Act) (765 ILCS 1065/1 *et seq.* (West 2008)). The court denied both motions, precipitating Conxall's appeal and iCONN's cross-appeal. MSA is not a party to either appeal.

¶ 2 In its appeal, Conxall contends that the trial court erred by denying its posttrial motion for three reasons. First, it contends that the trial court tendered an instruction to the jury that misstated the law and prejudiced its case. Second, it argues that the court should have instructed the jury to limit its consideration of a special interrogatory that MSA propounded to its deliberations over iCONN's cross-claim against MSA. Third, it argues that the jury's answer to the special interrogatory was against the manifest weight of the evidence. In its cross-appeal, iCONN claims that the trial court abused its discretion by denying its motion for attorney fees.

¶ 3                                    BACKGROUND

¶ 4 Conxall manufactures cable and connector assemblies used in electronic devices. The third-party defendant, MSA, is a Pennsylvania corporation that manufactures safety equipment for firefighters. Defendant iCONN was formed by defendants Richard Regole, Kerry Nelson, and Robert Smith, who are all former executive-level Conxall employees. Regole worked at Conxall from 1991 to 2000, serving as general manager, director of sales and marketing, and manufacturing director; Nelson worked at Conxall from 1997 to 2004, serving as national sales

manager and manager of industrial products; and Smith worked at Conxall from 1994 to 2006, serving as director of operations.

¶ 5    Defendants Jerome Vorel, Manual Sanchez, and Mario Caldera are former Conxall manufacturing employees who went to work for iCONN.  Vorel worked at Conxall from 1993 to 2008.  From 1993 to 2000, Vorel was a maintenance mechanic responsible for repairing leaky roofs, toilets that would not flush, and jammed doors.  In 2000, he became an industrial engineer.  Vorel left Conxall on June 24, 2008, and began working at iCONN on June 26.  Sanchez and Caldera worked on Conxall's assembly line from 1988 and 1992, respectively, to November 8, 2007, when both men began working at iCONN.

¶ 6    The events that gave rise to this lawsuit began in March 2006.  Around that time, Conxall secured a lucrative business opportunity to sell MSA cable assemblies and panel mounts for incorporation into the Firehawk, a firefighter's mask that MSA manufactured.  Once MSA notified Conxall that it had been chosen to supply the components, Conxall and MSA collaborated on a design for the cable assembly and panel mount.

¶ 7    After the design process concluded, Conxall began shipping parts to MSA.  MSA eventually became dissatisfied with the quality of Conxall's products.  As a result, MSA sought out iCONN so that it could also supply MSA with cable assemblies and panel mounts for the Firehawk.  In October 2007, Jim Flaherty, an MSA materials manager, contacted iCONN and spoke to Regole.  Flaherty told Regole that MSA was experiencing problems with Conxall because Conxall was struggling to deliver enough quality products to MSA in a timely manner.  Regole visited MSA's manufacturing facility on October 23, 2007.  During the visit, MSA agreed to allow iCONN to submit a bid for the Firehawk cable assembly and panel mount.

¶ 8    To assist iCONN, Flaherty gave iCONN (1) a sample cable assembly and panel mount, (2) MSA's quality control specifications, (3) two dimensional (2D) design drawings, and (4) three dimensional (3D) models.  Flaherty e-mailed Regole the 2D drawings and quality control documents on October 25.  Jeremy Steck, an MSA engineer, e-mailed the 3D models to iCONN on October 29.  Flaherty testified that the drawings MSA sent to iCONN "were the property of [MSA]," that the 2D drawings contained a proprietary title block with MSA's name on it, and that he told Regole the samples "were MSA parts."  When Steck e-mailed the 3D models, he did not refer to Conxall, and the models themselves bore no indicia of ownership as to any party.  According to Regole, he also asked Steck to send component drawings, but Steck refused because he believed that the component drawings belonged to Conxall.

¶ 9    Sometime around April 1, 2008, Conxall discovered that iCONN was also supplying MSA with cable assemblies and panel mounts.  Later that month, Conxall filed this lawsuit.

¶ 10    On March 9, 2009, Conxall added two claims alleging that iCONN misappropriated trade secrets with respect to products that Conxall had sold to three additional companies—Skybitz, Hach, and Kustom Signals, Inc. (KSI).  When all was said and done, Conxall had alleged that iCONN misappropriated four categories of purportedly secret information: (1) the overall design of the Firehawk products; (2) the designs and related information covering certain component parts that went into the Firehawk products; (3) the process that Conxall used to manufacture the Firehawk products; and (4) the overall designs of the Hach, Skybitz, and KSI products.

¶ 11    On November 16, 2009, defendants filed a motion to dismiss Conxall's amended complaint.  The trial court denied the motion on May 27, 2010.  On June 27, 2011, iCONN filed a third-party complaint against MSA.  iCONN's complaint set forth claims for indemnity and fraud.  The gist of iCONN's claims against MSA was that, assuming iCONN had

4

misappropriated a trade secret by using the information contained in the 2D and 3D files that MSA gave iCONN, MSA had misled iCONN into believing that MSA owned the information in the files.

¶ 12    On October 26, defendants filed a motion for summary judgment against Conxall. The court denied the motion, and the case proceeded to a jury trial.

¶ 13    After the close of evidence, the trial court instructed the jury. Over Conxall's objection, the court tendered instruction No. 18 to the jury, a nonpattern instruction, which stated: "the plaintiff must show that specific secrets were misappropriated. It is not sufficient to point to broad areas of technology and assert that something there must have been secret and misappropriated."

¶ 14    The court also tendered six special interrogatories to the jury. Special interrogatory No. 4, which was proffered by MSA, asked "[d]id MSA own the information contained in the two drawings and two [3D] files relating to the panel mount and cable assembly that MSA produced to ICONN?" In chambers, Conxall specifically objected to a different interrogatory that is not at issue in this appeal, but it did not specifically object to special interrogatory No. 4. After that objection was overruled and immediately before the parties and judge returned to the courtroom, one of Conxall's attorneys lodged a general objection to all of MSA's special interrogatories, stating simply, "I think I better—just for the record, Conxall objects to all MSA's proposed special interrogatories."

¶ 15    Ultimately, the jury returned a general verdict in favor of iCONN and answered special interrogatory No. 4 "yes." Conxall filed a motion for a new trial and judgment *n.o.v.*, and iCONN filed a motion for attorney fees. The trial court denied all three motions in a single order on December 20, 2013. With respect to iCONN's motion for attorney fees, the court stated:

"Defendant iCONN's Motion for Attorney Fees is denied. The Court finds that Conxall's claims were not frivolous and not brought in bad faith. There was sufficient circumstantial evidence for this finding that Conxall's claims were not brought in bad faith and were not frivolous." Conxall appealed, and iCONN cross-appealed.

¶ 16                                    ANALYSIS

¶ 17    In its appeal, Conxall has raised three issues. First, Conxall contends that the trial court erred by tendering instruction No. 18. Second, Conxall argues that the trial court erred by refusing to restrict the jury's consideration of special interrogatory No. 4 to its deliberations with respect to iCONN's case against MSA. Finally, Conxall claims that the jury's answer to special interrogatory No. 4 was against the manifest weight of the evidence. In its cross-appeal, iCONN argues that the trial court erred by denying its motion for attorney fees. We consider these arguments in turn.

¶ 18                    I. Instruction No. 18 Was Properly Granted

¶ 19    We first consider Conxall's claim that the trial court erred by tendering instruction No. 18. "The purpose of jury instructions is to provide the jury with correct legal rules that can be applied to the evidence to guide the jury toward a proper verdict." *People v. Lovejoy*, 235 Ill. 2d 97, 150 (2009); *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 507 (2002). To be proper, a jury instruction "must state the law fairly and *distinctly* and must not mislead the jury or prejudice a party." (Emphasis in original.) *Dillon*, 199 Ill. 2d at 507. "The decision whether to give a nonpattern instruction rests within the sound discretion of the trial court." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). "[A]s a court of review we will not disturb such a determination absent a clear abuse of discretion." *Surestaff, Inc. v. Azteca Foods, Inc.*, 374 Ill. App. 3d 625, 627 (2007). To determine if the trial court abused its discretion, "we look at the jury instructions,

taken as a whole, to determine whether they fairly, fully, and comprehensively instructed the jury of the relevant legal principles." *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 139. "A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 274 (2002).

¶ 20 Conxall has proffered a complex, multifaceted argument setting forth its belief that instruction No. 18 inaccurately stated the law and was misleading. But we need not adopt its approach because we find that the instructions, taken as a whole, "fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Schultz*, 201 Ill. 2d at 273-74. Specifically, instruction Nos. 15, 16, and 17, painstakingly set forth—in language almost indistinguishable from the relevant text of the Act—the definition of a trade secret, the elements of trade secret misappropriation, and Conxall's burden of proof. Of special relevance here, instruction No. 15 contained an extensive definition of the "trade secret." It stated, in relevant part:

> "A trade secret is information which may include but is not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers. To prove its information is entitled to special protection as a trade secret, Conxall must show that:
>
> > 1. The information is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its use or disclosure; and

2.  Conxall took reasonable efforts under the circumstances to maintain the secrecy or confidentiality of the information.

In determining whether Conxall has proven that it possessed a trade secret, you may consider the following factors:

1.  The extent to which the information was known outside of Conxall's business;

2.  The extent to which the information was known by employees and others involved in Conxall's business;

3.  The extent of measures taken by Conxall to guard the secrecy of the information;

4.  The value of the information to Conxall and its competitors;

5.  The amount of time, effort or money expended by Conxall in developing the information; and

6.  The ease or difficulty with which the information could be properly acquired or duplicated by others."

¶ 21    In light of this extensive definition of trade secret, as well as the other instructions that largely tracked the text of the Act, we find that the jury could not have been misled by instruction No. 18. Accordingly, under these circumstances, the trial court's decision to tender instruction No. 18 did not constitute an abuse of discretion. We therefore reject Conxall's first claim of error.

¶ 22        II. Conxall Forfeited Its Objection to Special Interrogatory No. 4

¶ 23    Next, Conxall contends that the trial court erred by failing to limit the jury's consideration of special interrogatory No. 4 to iCONN's case against MSA. A party may object

to a special interrogatory, but the objecting party must specifically object to an individual special interrogatory. See *Struthers v. Jack Baulos, Inc.*, 52 Ill. App. 3d 823, 826 (1977). In *Struthers*, the plaintiff lodged a general objection " 'for the record' " to a special interrogatory tendered by the defendant. *Id.* On appeal, this court held that the plaintiff forfeited any challenge to the interrogatory because, by lodging only a general objection, the plaintiff precluded the trial court from "mak[ing] a considered ruling" and prevented the defendant from propounding a corrected interrogatory. *Id.*

¶ 24    The record shows that Conxall only specifically objected to special interrogatory six on the basis that it was confusing and should only apply to iCONN's case against MSA. That specific objection was overruled. Immediately before the parties retired from the instruction conference in chambers, one of Conxall's attorneys lodged a general objection, stating, "I think I better—just for the record, Conxall objects to all MSA's proposed special interrogatories." Thus, just as in *Struthers*, Conxall forfeited any objection to special interrogatory No. 4.

¶ 25    III. The Jury's Answer to Special Interrogatory No. 4 Was Not Against the Manifest Weight of the Evidence

¶ 26    Next, Conxall argues that the trial court erred by failing to set aside the jury's answer to special interrogatory No. 4. A jury's answer to a special interrogatory will be set aside only if it is against the manifest weight of the evidence. *Simmons v. Garces*, 198 Ill. 2d 541, 561 (2002). " 'A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992) (quoting *Villa v. Crown Cork & Seal Co.*, 202 Ill. App. 3d 1082, 1089 (1990)).

¶ 27    Conxall argues that the jury's answer was against the manifest weight of the evidence because (1) there was testimony that the 3D models that MSA sent to iCONN contained some

9

internal dimensions and (2) Uber testified that MSA was not claiming to own "the internal design structure" of the cable assembly and panel mount. We disagree.

¶ 28 Although Conxall is correct that there was testimony showing that the 3D models revealed some internal dimensions and Uber testified that MSA was not claiming to own that information, Flaherty testified clearly and without qualification that the 2D design drawings and 3D models he gave to iCONN were "the property of MSA." In addition, Flaherty testified that he "never sent [Regole] anything that wasn't MSA owned" and that no one from Conxall told him that any of the information in the files belonged to Conxall.

¶ 29 Moreover, there was evidence showing that when iCONN communicated with MSA regarding the various files that MSA sent to iCONN, MSA never said that some part of the information contained in the files belonged to Conxall or was subject to a confidentiality agreement it had with Conxall. In essence, Conxall asks this court to reweigh the evidence, substitute its judgment for the jury's, and answer special interrogatory No. 4 in its favor. This court, however, does not reweigh contested evidence. See *Maple*, 151 Ill. 2d at 452-53 ("[T]he appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way."). We therefore affirm the trial court's denial of Conxall's posttrial motion.

¶ 30                           IV. iCONN's Attorney Fee Request

¶ 31 We next consider iCONN's cross-appeal. iCONN contends that it is entitled to receive its attorney fees from Conxall pursuant to section 5 of the Act. Section 5 provides "[i]f *** a claim of misappropriation is made in bad faith ***, the court may award reasonable attorney's fees to the prevailing party." 765 ILCS 1065/5 (West 2008). The question dispositive of this

issue is whether the trial court applied the correct legal standard when determining whether Conxall's claims were brought in "bad faith," as that term is used and understood in the Act.

¶ 32    That question is one of first impression in this court, and it has generated a sharp difference of opinion among the members of this panel.  As set forth below, I would apply the two-part test for bad faith articulated by the California Court of Appeals in *SASCO v. Rosendin Electric, Inc*., 207 Cal. App. 4th 837 (Ct. App. 2012).  My esteemed colleagues, on the other hand, believe that, when assessing bad faith under section 5 of the Act, courts may "be guided"—but not "constrained"—"by the body of case law construing [Illinois Supreme Court] Rule 137 [(eff. July 1, 2013)]." *Infra* ¶ 99 (Rochford, P.J., concurring); *infra* ¶ 108 (Hoffman, J., concurring).  Accordingly, this court holds, by a majority of two to one, that the appropriate standard to determine bad faith under section 5 of the Act is the position taken by Presiding Justice Rochford and Justice Hoffman.

¶ 33    In Presiding Justice Rochford's view, the fee issue should be remanded to the trial court so that it can reconsider the issue under the standard articulated in Presiding Justice Rochford's concurring opinion.  For the reasons expressed in *infra* ¶¶ 109-10, I cannot join Justice Hoffman's conclusion that "circumstantial evidence exists supporting" the trial court's conclusion that Conxall did not proceed in bad faith.  Rather, I have a strong belief that the record is replete with evidence to the contrary.  I would be inclined to simply reverse the trial court's denial of fees.  However, prudence suggests that an appropriate course may simply be to allow the court below to itself reconsider the issue upon due consideration of our analysis.  Accordingly, I concur with Presiding Judge Rochford to vacate the fee order and to remand for further proceedings.  I offer the following analysis to detail my own view of the evidence and to guide the trial court on remand.

¶ 34                            A. The Applicable Standard

¶ 35    As stated above, I would adopt the standard for determining bad faith articulated by the

California Court of Appeals in cases such as *SASCO v. Rosendin Electric, Inc.*, 207 Cal. App. 4th

837 (Ct. App. 2012), *FLIR Systems, Inc. v. Parrish*, 174 Cal. App. 4th 1270 (Ct. App. 2009), and

*Gemini Aluminum Corp. v. California Custom Shapes, Inc.*, 95 Cal. App. 4th 1249 (Ct. App.

2002).  In those cases, the court explained that "bad faith" in the context of California's trade

secret statute—which, like the Act, is derived from the Uniform Trade Secrets Act (UTSA)—

consists of (1) "objective speciousness" and (2) "subjective bad faith." (Internal quotation marks

omitted.) (Internal quotation marks omitted.) *SASCO*, 207 Cal. App. 4th at 845 (quoting Cal.

Civ. Code § 3426.4 (West 2008)). In my view, this definition of bad faith is correct for several

reasons.

¶ 36    Consider first the drafter's comment to section 4 of the UTSA, from which section 5 of

the Act is derived.[1]  The comment states: "Section 4 allows a court to award reasonable attorney

fees to a prevailing party in specified circumstances as a *deterrent* to *specious* claims of

misappropriation ***."  (Emphases added.) Unif. Trade Secrets Act § 4, Comment (2015).

Based on that statement, it is clear that the drafters intended for attorney fees to be awarded when

the plaintiff's trade secret claim was (1) objectively specious and (2) brought in subjective bad

faith.  With respect to the first requirement, one need look no further than the comment: the only

adjective the drafter's used to describe the sort of claims that should result in an award of fees

are *specious* ones.  The second requirement arises from the drafter's indication that fees should

*deter* specious claims, since a person or entity cannot be deterred from engaging in conduct that

_____

[1]The General Assembly adopted the Act in 1988 without significant comment.  As such, I find it appropriate to turn to the drafter's comments to the Uniform Act from which the Act traces its lineage. See *McArdle v. McArdle*, 55 Ill. App. 3d 829, 833 (1977) (when interpreting provisions of uniform laws, court may consult drafter's comments).

they do not know they are engaging in. See *Gemini*, 95 Cal. App. 4th at 1261 ("To be deterrable, conduct must be at least reckless or grossly negligent, if not intentional and willful." (quoting *Stilwell Development, Inc. v. Chen*, No. CV86-4487-GHK, 1989 WL 418783, at *3 (C.D. Cal . Apr. 25, 1989)).

¶ 37    Importantly, the words "specious" and "frivolous"—the latter being the standard under which Rule 137 motions are measured (see *Cult Awareness Network v. Church of Scientology International*, 177 Ill. 2d 267, 279 (1997); *Heckinger v. Welsh*, 339 Ill. App. 3d 189, 191 (2003))—mean different things.  Frivolousness is a demanding legal standard.  This court has explained that a claim or filing is frivolous when it contains "false allegations" made "without reasonable cause."  *Heckinger*, 339 Ill. App. 3d at 191.  And importantly, for a claim to be frivolous, its falsity must be readily ascertainable on its face.  See, *e.g.*, *Technology Innovation Center, Inc. v. Advanced Multiuser Technologies Corp.*, 315 Ill. App. 3d 238, 245 (2000) (finding allegation in plaintiff's complaint was frivolous where factual defect was "apparent" and the plaintiffs "kn[e]w, or should have known" about the defect).  In other words, if a claim cannot be judged frivolous based on the pleadings and obvious factual defects, it likely never will.

¶ 38    Speciousness is looser standard that embraces a wider range of claims.  Unlike a frivolous claim, a claim cannot be judged "specious" simply by reviewing the text of the plaintiff's complaint because specious claims are by definition superficially meritorious.  See Bryan A. Garner, A Dictionary of Modern Usage 825 (2d ed. 1995) (defining "specious" as "having superficial appeal but false"); see also Black's Law Dictionary 1529 (9th ed. 2009) (defining "specious" as "[f]alsely appearing to be true, accurate, or just"); *FLIR*, 174 Cal. App.

4th at 1276 ("Objective speciousness exists where the action superficially appears to have merit but there is a complete lack of evidence to support the claim.").

¶ 39    The foregoing discussion still begs the question whether frivolousness or speciousness is the appropriate standard for judging bad faith.  The text of section 5 readily supplies the answer.  Section 5 states that attorney fees should be awarded to "to the prevailing party."  As a case proceeds, a defendant has multiple opportunities to "prevail."  By its plain text, section 5 expresses no preference for defendants who prevail on a motion to dismiss versus a defendant who prevails on summary judgment or after a lengthy bench trial.  Yet, restricting the application of section 5 only to frivolous claims—that is, claims with obvious or apparent defects—achieves that precise result, since most claims will not be judged frivolous once the court moves past the pleadings.  In this way, the approach adopted by my colleagues significantly blunts the ability of section 5 to actually deter litigants like Conxall, since it is often the case that the factual baselessness of a claim can become apparent only after summary judgment or trial.  See *FLIR*, 174 Cal. App. 4th at 1283 (the court rejected the plaintiff's argument that the trial court's denial of the defendant's motion for summary judgment precluded an award of attorney fees, reasoning that "[i]f the rule were otherwise, a trade secrets plaintiff could file sham declarations to successfully oppose a summary judgment motion and immunize itself from sanctions"); *cf. Krautsack v. Anderson*, 223 Ill. 2d 541, 562 (2006) ("Because Rule 137 addresses the pleadings, motions and other papers a litigant files, the rule does not provide a sanction against all asserted instances of bad-faith conduct by a litigant or the litigant's attorney during the course of litigation.").

¶ 40    In holding that bad faith under section 5 is determined based on whether the plaintiff's claim violated the letter or spirit of Rule 137, my colleagues principally rely on *Krautsack*.  I do

not share this reliance. *Krautsack* had nothing to do with the law at issue here, which is a specific act governing a highly technical field. Instead, the issue before the court was how to define the term "bad faith" in the context of a motion for attorney fees pursuant to section 10a(c) of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/10a(c) (West 2004)).

¶ 41 More to the point, *Krautsack* simply does not support the position taken by my colleagues. Notably, in *Krautsack*, the plaintiff argued that the court should construe bad faith in the context of the Consumer Fraud Act as coterminous with bad faith under Rule 137. The court unambiguously rejected that argument, stating:

"Because Rule 137 addresses the pleadings, motions and other papers a litigant files, the rule does not provide a sanction against all asserted instances of bad-faith conduct by a litigant or the litigant's attorney during the course of litigation. [Citation.] For example, a party's pleadings may conform to Rule 137, yet the party may be guilty of other rule violations amounting to bad faith. We discern no reason why a prevailing defendant should be limited by Rule 137 in establishing a plaintiff's bad faith. Rule 137, and the body of case law that has developed around it, provide useful guidance to litigants and judges, but a defendant's failure to demonstrate bad faith by the plaintiff under Rule 137 is not fatal to a prevailing defendant's fee petition under the Act. Appellate court opinions which hold to the contrary, including *Krautsack I*, are overruled." *Id*. at 562.

¶ 42 Thus, to the extent it is even relevant, *Krautsack* strongly suggests that the Rule 137 definition of bad faith is not a one-size fits all standard applicable to every Illinois statute containing a fee-shifting provision that hinges on the plaintiff acting in bad faith. *Id*.

¶ 43                    B. iCONN Has Made a Strong Case for Attorney Fees

¶ 44     Applying the framework described in *SASCO*, I note that the record is replete with evidence that Conxall's claims were both objectively specious and brought in subjective bad faith. "An objectively specious claim is one that is completely unsupported by the evidence [citation], or one that lacks proof as to one of its essential elements." *JLM Formation, Inc. v. Form+Pac*, No. C 04-1774 CW, 2004 WL 1858132, at *2 (N.D. Cal. Aug. 19, 2004). In making that showing, a defendant is not required to "prove a negative" by conclusively disproving the plaintiff's claim. *SASCO*, 207 Cal. App. 4th at 848. Rather, the defendant's burden under the objective speciousness prong is satisfied by a simple showing that there was an "absence of evidence" with respect to an element of the plaintiff's claim. *Id*. There is ample support in the record from which the trial could conclude that iCONN has satisfied this burden.

¶ 45     First, with respect to Conxall's claims pertaining to the overall design of the Firehawk products, Conxall did not prove that (1) it owned the designs and (2) the designs were even secret. With respect to the ownership issue, the evidence at trial showed that Conxall and MSA jointly designed the Firehawk products. The evidence further showed that MSA maintained total control over the design. Conxall's own witnesses—specifically Smaczny, Conxall's director of engineering, and Kryza, one of Conxall's engineers—conceded during their respective cross-examinations that MSA "had the final call" on all elements of the design and that when MSA rejected Conxall's design proposals, MSA, would tell Conxall how the design needed to be changed and Conxall would implement the changes "as instructed."

¶ 46     Moreover, the evidence showed that in September 2006, Scott Sanchez, a Conxall sales manager, sent an e-mail to his colleagues expressing concern about whether Conxall or MSA would own the designs. At trial, Sanchez acknowledged that he never sent the e-mail to anyone

at MSA and he testified that no one at Conxall ever asked MSA to sign a contract turning over ownership of the designs to Conxall.

¶ 47    To make matters worse, Conxall could not even prove that the designs were secret because it never entered into a confidentiality agreement with MSA.  To be sure, Conxall tried to prove that it obtained an oral confidentiality agreement with MSA and that Steck bound MSA to a written confidentiality agreement by signing design drawings that contained Conxall's proprietary title block.  Those arguments, however, were hopelessly meritless, as the evidence showed that MSA itself rejected these assertions long before trial.

¶ 48    Specifically, the evidence showed that in February 2009, Bandolik told Jacqueline Debick, a senior buyer at MSA, that Conxall and MSA had a confidentiality agreement.  After Debick asked Bandolik to produce the agreement, Bandolik admitted that Conxall did not have "a single written agreement with MSA."  Bandolik nonetheless insisted that the parties had a confidentiality agreement because MSA signed drawings that contained Conxall's title block and MSA orally agreed to confidentiality.  On March 2, 2009, Debick replied to Bandolik, informing him that MSA's law department had no record of a confidentiality agreement.  Moreover, she stated that "[t]he lack of a written confidentiality agreement confirms that no such understanding as to confidential information was ever agreed to by MSA."

¶ 49    Thus, the record shows that by no later than March 2, 2009, Conxall was on notice that it did not have a confidentiality agreement with MSA.  Accordingly, the record shows that as of March 2, 2009, Conxall knew that it did not have a confidentiality agreement with MSA, and it knew that the title block and oral agreement theories were unfounded.

¶ 50    That conclusion is reinforced by testimony elicited from James Uber, MSA's general counsel.  Uber testified that MSA does not, as a matter of corporate policy, enter into oral

confidentiality agreements. Moreover, he testified that he "did not believe that there was any kind of agreement or contract between MSA and Conxall with regard to confidentiality."

¶ 51 Additional evidence that Conxall's confidentiality claims were factually baseless came from Sanchez, whose testimony established that Conxall concocted the title block theory for purposes of advancing this litigation after it learned that it did not have a genuine confidentiality agreement with MSA. The evidence showed that Bandolik asked Sanchez to find a confidentiality agreement after Conxall discovered iCONN's competition. Sanchez's search proved fruitless, and according to him only then did Conxall begin internal discussions about whether the signed design drawings could serve as a confidentiality agreement.

¶ 52 Numerous witnesses confirmed Conxall's stance in this regard. Regole, Smith, and Nelson all explained that during their tenure, Conxall required that its customers sign design drawings to confirm the drawing depicted what the customer wanted. Sanchez corroborated that understanding, explaining that he "never heard anyone take a position other than that" until Conxall filed this lawsuit. Even Conxall's witnesses confirmed this view. Kryza conceded that the Firehawk project could not proceed unless Steck approved the drawings, and he acknowledged that when he e-mailed Steck drawings, he did not (1) mention the title block; (2) refer to confidentiality; or (3) inform Steck that by signing the drawings, he was actually entering into a confidentiality agreement with Conxall.

¶ 53 The title block theory was also undermined by Dunmead, who candidly admitted that Bandolik was the only Conxall employee who could execute a confidentiality agreement. The record is devoid of evidence, however, showing that Bandolik signed any of the drawings. Thus, Conxall's title block theory was actually inconsistent with its own business practices.

18

¶ 54    These facts make it apparent that Conxall's oral agreement and title block theories were nothing more than "fabricated, *post-hoc* notions lacking a scintilla of factual or legal support." *Contract Materials Processing, Inc. v. Kataleuna GmbH Catalysts*, 222 F. Supp. 2d 733, 746 (D. Md. 2002).  Because Conxall could not prove that it had a confidentiality agreement with MSA, its trade secret claim with respect to the design of the Firehawk cable assembly and panel mount suffered a total failure of proof as to a critical element, namely that the designs were a trade secret.  Accordingly, there is support for a finding that Conxall's claims with respect to the Firehawk cable assembly and panel mount were objectively specious.

¶ 55    Conxall's claims with respect to the Firehawk products' component parts fared no better. At trial, Conxall failed to produce any evidence showing that the designs of the component parts were not generally known in the industry.  Conxall's witnesses opined that Conxall's use of component parts like a coupling nut was not generally known in the industry.  When Conxall's witnesses were cross-examined, however, they conceded that Conxall was not the first company to use any of the components parts at issue in this case and that the only secret aspect of the components was their specific dimensions, which, Conxall's witnesses conceded, could be readily ascertained using a vision system.  Notably on that point, iCONN elicited extensive testimony from Regole, Smith, and Bill Alvelo, one of its engineers, establishing that iCONN obtained dimensions for the component parts by dissecting product samples and measuring with calipers, height gauges, and a "vision system" capable of 150x magnification that gave "precise measurements."   When a company can acquire its competitor's allegedly secret information "with relative ease, 'the inference is that the information was either essentially "public" or is of de minimis economic value.' " *Trident Products & Services, LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 779 (E.D. Va. 2012) (quoting *MicroStrategy Inc. v.*

*Business Objects, S.A.*, 331 F. Supp. 2d 396, 416-17 (E.D. Va. 2004)). Again, as to this issue, there is support in the record that Conxall's claims with respect to the component parts were objectively specious.

¶ 56    I next address whether there is evidence showing that Conxall's claims with respect to the Skybitz, KSI, and Hach products were objectively specious. Conxall failed to produce any evidence whatsoever establishing that any of the designs were not generally known in the industry. Cooper and Anthony did offer vague and conclusory testimony that the designs for these products were trade secrets, but that testimony was obliterated on cross-examination. Cooper, for example, conceded that aspects of the designs were in fact generally known and "probably not trade secrets." Yet, he conceded that he did not conduct any study to separate the secret from the not secret, and so his testimony had zero evidentiary value. The same was true of Anthony, who like Cooper also failed to undertake any study to determine what aspects of the designs were secret and what was generally known. Anthony instead opined based on his "personal knowledge," which he acknowledged could not be independently verified. Thus, as with Cooper, Anthony's testimony was worthless. And to ice an already iced cake (1) Cooper and Dunmead both conceded that they did not even know if Conxall and iCONN sold the same product to Hach, (2) Cooper testified that he was not aware of any Conxall drawings relating to Hach that had been found in iCONN's possession, and (3) Anthony admitted that he never compared Conxall and iCONN's Hach drawings or examined a physical sample of iCONN's Hach product.

¶ 57    The inability of Conxall's witnesses to identify a single specific aspect of the design of the MSA, Skybitz, KSI or Hach products that was a trade secret provides further factual support for a finding that Conxall's claims were objectively specious.

¶ 58 Finally, there is support in the record that Conxall's claims regarding its manufacturing process were objectively specious. At trial, Conxall presented testimony from James Considine, its vice president of manufacturing. During his cross-examination, Considine was confronted with a December 2007 e-mail he sent to his colleagues in preparation for a visit that some MSA employees were making to Conxall's facility. With respect to the alleged secrecy of Conxall's manufacturing process, the e-mail could not be more damning for Conxall's case. Considine wrote: "There are few places where we employ 'special' processes or technology, so there really is nothing that we shouldn't show them."

¶ 59 It is difficult to imagine a person better situated to opine on the secrecy and novelty of Conxall's manufacturing methods than its vice president of manufacturing. And as the above-quoted e-mail shows, Considine (and by extension, Conxall) knew in December 2007—long before this case was ever filed—that its manufacturing process was not a trade secret.

¶ 60 And that is not all. Bandolik—who verified Conxall's complaint under penalty of perjury—admitted that he could not identify any specific manufacturing process that Conxall used that was not generally known in the industry. Likewise, Anthony conceded that he did not conduct any study to determine whether Conxall's manufacturing processes were not generally known in the industry.

¶ 61 Then there was Dunmead, who, when pressed by iCONN's attorney to identify just one specific part of the manufacturing process that was not generally known in the industry, instead replied "[t]he entire process is secret." That statement led to the following colloquy in which Dunmead conceded that Conxall's method of crimping contacts was both generally known in Conxall's industry and yet somehow simultaneously a secret to Conxall:

"Q. *** Is crimping a contact onto a wire a secret?

A.  Yes.

Q.  It is?

A.  Yes.

Q.  It is something that only Conxall knows how to do?

A.  No.

Q.  Okay.  That part isn't a secret, right?  You would agree with that?

A.  No.

Q.  You wouldn't agree with that?

A.  That's correct.

Q.  So when everybody else does it, it is common knowledge, but when you do it, it's a secret; is that right?

A.  In sum total with all the rest of the processes, the entire process is a trade secret, yes.

Q.  Well, I want to know about crimping a contact.  I want to know whether crimping a contact is something that is a secret that belongs to Conxall.

A.  It could be.

Q.  What does Conxall do to crimp a contact in the MSA Firehawk cable assembly and panel mount that only Conxall knows how to do?  What is it?

A.  On that particular product, nothing.

Q.  Nothing.

A.  Yes.

Q.  So that part isn't a secret, right?

A.  I believe it is, yes."

¶ 62    Not only does the record contain support for a finding that Conxall's claims were objectively specious, it also contains support for a finding that they were brought in subjective bad faith. Subjective bad faith "means the action was commenced or continued for an improper purpose, such as harassment, delay, or to thwart competition." *SASCO*, 207 Cal. App. 4th at 847. Subjective bad faith is present " 'where a plaintiff knows or is reckless in not knowing that its claim for trade secret misappropriation has no merit.' " *Contract Materials*, 222 F. Supp. 2d at 744 (quoting *Computer Economics, Inc. v. Gartner Group, Inc.*, No. 98-CV-0312 TW (CGA), 1999 WL 33178020, at *6 (S.D. Cal. Dec. 14, 1999)). To be clear, "the test is not what the plaintiff believed about its objectively specious claim, but for what *purpose* it pursued such a claim." (Emphasis in original.) *Cypress Semiconductor Corp. v. Maxim Integrated Products, Inc.*, 236 Cal. App. 4th 243, 267 (Ct. App. 2015). Thus, "[i]f the court finds that a claim is objectively specious, and that the plaintiff made it for an improper purpose, there is no further requirement that the court also find a lack of 'subjective belief in the merits of its case.' " *Id*.

¶ 63    To determine whether a claim was brought for an improper purpose, courts may consider "evidence of the plaintiff's knowledge during certain points in the litigation" as well as the degree of speciousness of the plaintiff's claims. *JLM Formation*, 2004 WL 1858132, at *2; see *Contract Materials*, 222 F. Supp. 2d at 744. Thus, even if a claim was initially brought in good faith, evidence that the plaintiff later knew or gained knowledge that its claims were factually baseless may constitute evidence of subjective bad faith. See *FLIR*, 174 Cal. App. 4th at 1278. In addition, the timing of the plaintiff's lawsuit relative to other events germane to the plaintiff's and defendant's respective businesses is a relevant factor courts should consider. *Id*.; *Gemini*, 95 Cal. App. 4th at 1263; see also *Contract Materials*, 222 F. Supp. 2d at 748 (fact that plaintiff's claim was brought after plaintiff learned that the defendant corporation might obtain a cash

23

infusion from outside investors was evidence of bad faith based on inference that the defendants would seek quick settlement so as to not scare off investors).

¶ 64    The court may also take into account evidence showing that the plaintiff used the litigation as a means of conveying its litigiousness to other market participants, including the plaintiff's competitors as well as its business partners. See, *e.g.*, *Cypress Semiconductor Corp. v. Maxim Integrated Products, Inc.*, 236 Cal. App. 4th 243, 269 (Ct. App. 2015) (evidence showing that, after plaintiff dismissed its lawsuit, it issued a press release indicating its willingness to " 'file again if we perceive more unfair efforts to hire away our employees' " supported an inference that the plaintiff's lawsuit which it later dismissed was filed for the purpose of inhibiting lawful conduct). And of course, the court should consider statements made by the plaintiff (including in the case of a business, its officers, and its employees) that shed light on the true reason the lawsuit was filed. See, *e.g.*, *FLIR*, 174 Cal. App. 4th at 1285 (statement by the plaintiff's CEO that the plaintiff " 'couldn't tolerate a direct competitive threat by [respondents] because it would fly in the face of everything that we spent 200 million dollars to buy' " was evidence that the plaintiff's claim was brought in bad faith).

¶ 65    The record contains abundant evidence that Conxall's claims were brought in subjective bad faith. First, the evidence at trial established that that once Conxall began shipping product to MSA, MSA almost immediately began lodging complaints about the quantity and quality of Conxall's shipments. By the middle of November, MSA reported to Conxall that it had two products returned to it that had life-threatening defects, and by January 4, MSA informed Conxall that it had to shut down its production line because Conxall had not shipped enough quality product that MSA could use. By April 4, 2008, MSA informed Conxall that it would not

purchase any more cable assemblies and panel mounts until it corrected its quality problems. In light of these facts, Sanchez explained at trial that Conxall was "blowing the deal" with MSA.

¶ 66    The record further establishes that, when MSA told Conxall that it would not place additional orders until it rectified its quality problems, Conxall had known for at least one day that iCONN was also supplying products to MSA. Accordingly, Conxall had to have known that it was in real jeopardy of losing MSA's business. Armed with this awareness and knowing that it could not gainfully compete with iCONN in the marketplace, Conxall filed this lawsuit to (1) financially cripple iCONN and (2) render iCONN legally unable to compete for MSA's business. The strength of this inference is underscored by the baseless nature of Conxall's claims set forth above.

¶ 67    Second, the allegations contained in Conxall's complaint, and MSA's actions after the complaint was filed, also suggest that Conxall filed this lawsuit for the singular purpose of thwarting iCONN's legitimate competition for MSA's business. Although Conxall's original complaint did not name MSA as a defendant, it nonetheless signaled that Conxall believed that MSA had acted wrongfully by engaging with iCONN. Specifically, Conxall's complaint alleged that (1) MSA approved design changes by signing off on drawings that Conxall sent MSA, (2) "[e]ach and every drawing Conxall submitted to MSA acknowledged that the design was Conxall's," and (3) Conxall "never gave permission" for anyone to copy the drawings and it did not "give MSA authority to distribute the drawings." Despite the fact that MSA had previously told Conxall it would not place any more orders until Conxall fixed its quality problems, after the lawsuit was filed, MSA began ordering products from Conxall again. The content of Conxall's complaint, in conjunction with the chronology above, demonstrates that Conxall filed this lawsuit in part to signal to MSA that it was willing to litigate over the Firehawk business and that

25

it believed MSA breached a legal obligation it owed to Conxall. See *Cypress Semiconductor Corp. v. Maxim Integrated Products, Inc.*, 236 Cal. App. 4th 243, 269 (Ct. App. 2015) (evidence showing that, after plaintiff dismissed its lawsuit, it issued a press release indicating its willingness to " 'file again if we perceive more unfair efforts to hire away our employees' " supported inference that the plaintiff's lawsuit which it later dismissed was filed for the purpose of inhibiting lawful conduct); *Contract Materials*, 222 F. Supp. 2d at 748 (fact that plaintiff's claim was brought after plaintiff learned that the defendant corporation might obtain a cash infusion from outside investors was evidence of bad faith based on inference that the defendants would seek quick settlement so as to not scare off investors).

¶ 68    Third, Conxall's witnesses admitted that Conxall filed this lawsuit for an anticompetitive purpose. At trial, Bandolik testified that (1) Conxall's parent company, Switchcraft, purchased Conxall for $30 million; (2) all Conxall employees are required to review an employee handbook that discusses confidentiality obligations; and (3) Regole, Smith, and Nelson were required to sign confidentiality agreements at that time of the acquisition. According to Bandolik, the confidentiality agreement precluded Regole, Nelson, and Smith from speaking to Conxall customers about custom products sold by Conxall or working on any custom products that Conxall had "ever made." Similarly, Bandolik testified that the handbook "bars Conxall's former employees from ever working on any of the products that Conxall has ever made" as well as "any product, even if Conxall didn't make it, that performs the same product and mates properly with Conxall's product." In a similar vein, Bandolik stated that Conxall's custom product customers belonged to Conxall "forever."

¶ 69    This testimony shows that Conxall believed it was entitled to exist in a marketplace free from competition, and that when that view was shattered by the reality of iCONN's competition,

Conxall filed this lawsuit to accomplish in court what it could not accomplish in the free market—defeat iCONN's competition. See *FLIR*, 174 Cal. App. 4th at 1285 (statement by the plaintiff's CEO that the plaintiff " 'couldn't tolerate a direct competitive threat by [respondents] because it would fly in the face of everything that we spent 200 million dollars to buy' " was evidence that the plaintiff's claim was brought in bad faith).

¶ 70    Furthermore, Bandolik admitted that he was one of the people who made the decision to pursue this case and candidly acknowledged that one of the reasons the case was filed was to "put iCONN *** out of business." Likewise, Dunmead testified that he was one of the people who made the decision to file suit against iCONN and that he would "personally *** love to see iCONN out of business." This testimony further supports a finding that Conxall pursued its trade secret claims in subjective bad faith. See *FLIR Systems*, 174 Cal. App. 4th at 1276.

¶ 71    Fourth, Conxall's attorneys conceded during opening statements and closing arguments that Conxall could not prove its claims. During his opening statement, Conxall's attorney stated "[t]here may be some paths to get iCONN this proprietary and confidential information that none of us never know the answer to." In line with that concession, during his closing argument, Conxall's attorney repeatedly disclaimed any obligation on the part of Conxall to prove how iCONN allegedly misappropriated Conxall's purportedly secret information, stating at various points, "[w]e don't have to prove what that source was, although there are lots of candidates"; "the law doesn't require that we tell you exactly what their sources are"; and "[i]t's enough that using reasonable inferences under the law, your common sense, that you know they stole the designs because they've been caught with it in their hands."

¶ 72    The law is precisely the opposite. To prove that iCONN misappropriated secret information, Conxall was required to show that defendants either (1) acquired Conxall's

information by "improper means," *i.e.*, by "theft, bribery, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means" or (2) used Conxall's information after acquiring it (a) by improper means, or (b) under circumstances giving rise to a duty on the part of defendants to maintain its secrecy, or (c) from someone who had a duty to maintain its secrecy. See 765 ILCS 1065/2(a), (b) (West 2014).

¶ 73    It is thus clear from the plain language of the Act that "[t]he essential element of a misappropriation claim is the 'abuse of confidence or impropriety in the means of procurement.' " *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 660 (4th Cir. 1993) (quoting *Space Aero Products Co. v. R.E. Darling Co.*, 208 A.2d 74, 84 (Md. Ct. Spec. App. 1965)); *Contract Materials*, 222 F. Supp. 2d at 747 (finding that claim was objectively specious because the plaintiff "failed to identify any admissible probative evidence that defendants acquired the Technology through improper means"); see also Restatement (First) of Torts § 757 cmt. a (1939) ("It is the employment of improper means to procure the trade secret, rather than the mere copying or use, which is the basis of the liability ***."). Thus, the specific circumstances under which defendants acquired or used Conxall's allegedly secret information are crucial considerations in assessing whether misappropriation took place.

¶ 74    It is difficult to understand how, for example, Conxall could prove that iCONN induced someone to "breach a confidential relationship" without identifying the person or entity that it had a confidential relationship with and the contours of the relationship. See *Contract Materials*, 222 F. Supp. 2d at 747 (court examined technology transfer agreement to determine whether information was acquired through improper means). Accordingly, Conxall's admission during its opening statement and closing argument that it could not prove how iCONN misappropriated

its allegedly secret information, coupled with Conxall's disclaimer of responsibility thereto, is further evidence that Conxall brought this case in subjective bad faith.

¶ 75    Fifth, the record shows that Bandolik admitted that Conxall lacked a factual basis for many of the allegations contained in its complaint. Conxall filed pleadings on April 25 and August 8, 2008, and added claims on March 11, 2009. Every pleading was verified by Bandolik. Among other things, Conxall alleged in its amended complaint (1) that Sanchez was responsible for "developing" Conxall's "manufacturing processes" in order to meet the "print specifications of the MSA panel and cable assemblies" and avoid quality control problems; (2) that Caldera had "significant input" into Conxall's engineering designs for the cable assembly; (3) that iCONN hired Sanchez and Caldera "with the expectation that they would" disclose trade secrets to iCONN regarding Conxall's "engineering prints" and the "confidential processes and procedures" that Conxall developed in order to assemble the MSA products; (4) that iCONN and its executives "knew or had reason to know" that, when MSA gave iCONN the product samples, TST files, and 2D and 3D files, that MSA had a duty to maintain that information's secrecy; (5) that iCONN obtained Conxall's trade secrets by inducing MSA to "breach the confidential relationship it had with Conxall"; and (6) that with respect to the Skybitz, KSI, and Hach products, Nelson, Regole, Smith, and Vorel misappropriated information pertaining to the design drawings, pricing, contracts, and manufacturing processes.

¶ 76    Bandolik swore to these allegations under penalty of perjury. Yet Bandolik admitted both during his April 27, 2012, deposition and at trial that that he lacked knowledge or a factual basis for many of the allegations contained in Conxall's amended complaint. For example, when cross-examined, Bandolik admitted that he did not actually know what the manufacturing processes were that Conxall claimed were a trade secret:

29

"Q. And you can't tell us specifically what manufacturing processes Conxall uses that Conxall claims are unknown outside of Conxall, correct?

A. No, I cannot."

This concession is significant because if Bandolik could not identify what aspect of Conxall's manufacturing process was a trade secret, then he could not have had a factual basis for the allegation that iCONN misappropriated it. See *Perlan Therapeutics, Inc. v. Superior Court*, 178 Cal. App. 4th 1333, 1350 (Ct. App. 2009) ("If Perlan does not know what its own trade secrets are, it has no basis for suggesting defendants misappropriated them.").

¶ 77    Similarly, at trial, Bandolik acknowledged that he did not have firsthand or personal knowledge of what Sanchez or Caldera did at Conxall with respect to the Firehawk cable assembly and panel mount. The complaint that Bandolik verified, however, alleged that Sanchez helped Conxall develop the manufacturing process for the MSA products and that Caldera had "significant input" into Conxall's engineering designs.

¶ 78    Likewise, during his deposition, Bandolik acknowledged that he did not know (1) if any former Conxall worker took any 2D or 3D files to iCONN or (2) how iCONN actually set up its assembly line to manufacture the Firehawk cable assembly and panel mount. In the complaint that Bandolik verified, Conxall alleged that iCONN hired Sanchez and Caldera "with the expectation that they would" disclose trade secrets to iCONN regarding Conxall's "engineering prints" and "confidential processes and procedures."

¶ 79    Moreover, during his deposition, Bandolik acknowledged that he could not identify any specific documentary evidence proving that iCONN and Conxall ever sold the same product to Hach. Likewise, with respect to KSI, Bandolik admitted during his deposition that he knew

practically nothing about the KSI products. Indeed, as the following colloquy shows, Bandolik had no knowledge about the KSI products:

"Q. You said earlier there were multiple products that were at in [*sic*] this lawsuit that were being sold to Kustom Signals.

Are all of these products—do all these products fall within the same general category?

A. I don't know.

Q. You don't know what the products are?

A. No, I just—those are custom part numbers.

Q. No, but I'm asking you about the products now that are the subject of this lawsuit.

Do you know what Conxall products are the subject of this lawsuit?

\*\*\*

THE WITNESS: I don't know the specific products, I just see the part numbers. They're custom numbers, I would have to see the print."

¶ 80    Bandolik continued along this line. The pertinent testimony reads:

"Q. Can you tell me what is a trade secret about any of these Kustom Signals products?

A. Yeah, they're all custom part numbers.

Q. The part numbers are the secret?

A. \*\*\* I don't know what, specifically are on those individual specifications, but they are signed off on the drawings, as far as I know.

Q. So they're trade secrets because, like all of your custom products, a customer signed off on a drawing; is that accurate?

A. Well, in some cases beyond that. But in this particular case, I believe, to the best of my knowledge, that these were custom part numbers *** that [KSI] procured from us. So we get that straight.

Q. Do you have an understanding as to whether any portion of the design of the [KSI] part is not generally known in the industry?

A. I don't know.

Q. Do you have any information as to whether any portion of the manufacturing process used to create the products sold to [KSI] is not generally known in the industry?

A. I don't know."

¶ 81    Bandolik's testimony shows a conscious awareness on his part that the allegations in Conxall's pleadings were not supported by a reasonable factual basis. Under these circumstances, Conxall knew that its lawsuit was not filed to vindicate any legitimate legal rights, as Bandolik's concessions vitiated the existence of any such rights. Simply put, if Bandolik did not know what was a trade secret about the KSI product, he had no basis to allege that iCONN misappropriated it. *Perlan*, 178 Cal. App. 4th at 1350. These concessions, taken in conjunction with Conxall's knowledge that it was on the cusp of losing MSA's business and the timing of the lawsuit, supports the inference that Conxall filed this lawsuit in subjective bad faith in order to thwart iCONN's competition and illegitimately retain MSA's business.

¶ 82    For these reasons, I believe that iCONN has made an exceptionally strong case that it should be awarded attorney fees on remand, even under the more stringent standard adopted by

the majority of this panel. Having said that, I agree with Justice Rochford that the case should be remanded to the trial court for reconsideration of iCONN's motion.

¶ 83                              CONCLUSION

¶ 84    For the reasons stated in this lead opinion and the opinions of the panel members, this court affirms the trial court's order denying Conxall's various requests for posttrial relief, vacates the court's order denying iCONN's motion for attorney fees, and remands the case to the trial court for further proceedings. The proceedings on remand should be guided by the concurring opinion of Justice Rochford.

¶ 85    Affirmed in part, vacated in part, and remanded with directions.

¶ 86    PRESIDING JUSTICE ROCHFORD, specially concurring.

¶ 87    I concur with Justice Delort's conclusions in parts I, II, and III of this opinion and agree that the judgment in favor of defendants and the denial of Conxall's posttrial motion should be affirmed.

¶ 88    As to part IV (iCONN's cross-appeal), I disagree (1) that the term "bad faith" found in section 5 of the Act should be construed under the two-prong test set forth in *SASCO v. Rosendin Electric, Inc.*, 207 Cal. App. 4th 837 (Ct. App. 2012); (2) that this court should express a belief, strong or otherwise, that Conxall's claims were brought in bad faith (*supra* ¶ 33); and (3) that the trial court should be guided by the review of the evidence set forth above, which is *dicta* and was made under the standards of *SASCO* (*supra* ¶¶ 44-82). I would vacate the order denying iCONN's motion for fees and remand to the trial court for consideration of the motion for attorney fees with directions as discussed below.

¶ 89    In its cross-appeal, iCONN argues that the trial court erred in denying its request for attorney fees under section 5 of the Act. That section provides that, "[i]f *** a claim of

misappropriation is made in bad faith \*\*\*, the court may award reasonable attorney's fees to the prevailing party." 765 ILCS 1065/5 (West 2012). Where a statute provides that a court "may" award attorney fees, the award lies within the discretion of the trial court and will be overturned only upon a showing of an abuse of discretion. *Armour Swift-Eckrich v. Industrial Comm'n*, 355 Ill. App. 3d 708, 711-12 (2005); *Timan v. Ourada*, 2012 IL App (2d) 100834, ¶ 29. An abuse of discretion may be found when there is an error of law. *US Bank, National Ass'n v. Avdic*, 2014 IL App (1st) 121759, ¶ 18.

¶ 90    The Act does not define the term "bad faith." Where there is an undefined term in a statute, the well-settled principle of statutory interpretation requires that courts give the term its ordinary and commonly understood meaning. *People v. Ward*, 215 Ill. 2d 317, 325 (2005). Our review of an issue of statutory interpretation is *de novo*. *Alvarez v. Pappas*, 374 Ill. App. 3d 39, 43 (2007).

¶ 91    iCONN urges the adoption of the two-prong test set forth in *SASCO* for determining whether a claim of misappropriation has been made in "bad faith" such that the court may award reasonable attorney fees under section 5 of the Act. The *SASCO* two-prong test requires findings both that the plaintiff's claim was objectively specious and maintained with subjective bad faith. *SASCO*, 207 Cal. App. 4th at 845. For several reasons, I would reject the adoption of this test.

¶ 92    First, section 5 of the Act plainly states that "bad faith" is the sole cornerstone for an award of fees to a prevailing party (765 ILCS 1065/5 (West 2012)); the provision does not include the term "objective speciousness." In construing a statute, "[c]ourts may not depart from the plain language of a statute by reading into it exceptions, conditions, or limitations that the legislature did not express." *Skaperdas v. Country Casualty Insurance Co.*, 2015 IL 117021, ¶ 15.

¶ 93    Further, the *SASCO* court, in accepting the two-prong test, relied on the legislative purpose behind the fee provision (*SASCO*, 207 Cal. App. 4th at 846), which is found in the comment to the fee provision of the Uniform Trade Secrets Act (UTSA).  That comment states that a fee award serves "as a deterrent to specious claims of misappropriation."  Unif. Trade Secrets Act § 4, Comment (2015). However, section 5 of the Act does not include a similar comment.  Because the comment of the UTSA was not adopted by our legislature, I believe the comment and the case law interpreting the fee provisions of other state trade secret statutes in accordance with the UTSA's comment "to be of little value."  *Dass v. Yale*, 2013 IL App (1st) 122520, ¶ 40 (where this court made a similar conclusion based on the fact that the legislature in adopting the Limited Liability Company Act (805 ILCS 180/10-10 (West 2010)), did not adopt the relevant comment of the Uniform Limited Liability Company Act (1996)).  Instead, I would construe section 5 of the Act by its plain language that fees may be awarded to a prevailing party upon a showing of bad faith as that term is commonly understood in this state.

¶ 94    Finally, I note that, while federal courts have accepted the two-prong test of *SASCO*, state courts have shown a reluctance to do so in their interpretations of bad faith contained in the fee provisions of the trade secret acts of their states.  *Krafft v. Downey*, 68 A.3d 329, 338 n.12 (Pa. Super. Ct. 2013) ("The [two-prong] test has taken hold in federal trial courts with precious little analysis.  Without advocacy and a thorough analysis of other available alternatives, we refuse to join the parade.").  The superior court of Pennsylvania in *Krafft*, explained its refusal to adopt the two-prong test of *SASCO*, in this way:

> "[I]t does not appear that the two-prong test garners the support of the majority of
>
> other states that have enacted the UTSA and its attorney's fee provision.
>
> [Citation.] *** As explained, our research reveals that the courts of only one

state—California—have adopted this test. [Citation.] The remaining states that have defined bad faith for the purpose of awarding attorney's fees under the UTSA have not adopted a uniform test. Indeed, the only uniformity among these states' tests is that each of them draws on their own state's pre-existing test for defining bad faith. [Citation.]" *Id*. at 336.

¶ 95 I am persuaded by the analysis of *Krafft* and conclude that the term "bad faith" in section 5 of the Act should be given the preexisting definition of "bad faith" of this state.

¶ 96 Though no Illinois court has previously been asked to interpret "bad faith" within section 5 of the Act, our supreme court in *Krautsack v. Anderson*, 223 Ill. 2d 541 (2006), had the opportunity to announce a test for determining bad faith in the context of awarding statutory attorney fees to a prevailing defendant under the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/10a(c) (West 2004)). In *Krautsack*, our supreme court first held that when a prevailing defendant petitions the trial court for a reasonable attorney fee under section 10a(c) of the Consumer Fraud and Deceptive Business Practices Act, the defendant must show the plaintiff acted in bad faith. See *id.*; *Krautsack*, 223 Ill. 2d at 559.

¶ 97 In considering the proper standard for judging a plaintiff's bad faith in that context, our supreme court in *Krautsack* cited Illinois Supreme Court Rule 137 (eff. July 1, 2013), which states in relevant part:

"The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other document; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to

cause unnecessary delay or needless increase in the cost of litigation. *** If a pleading, motion, or other document is signed in violation of this rule, the court, upon motion or upon its own initiative, may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion or other document, including a reasonable attorney fee."

¶ 98    Our supreme court recognized that the purpose of Rule 137 is to penalize claimants who bring vexatious and harassing actions and to prevent false and frivolous filings. *Krautsack*, 223 Ill. 2d at 561-62. Our supreme court, however, further noted:

> "Because Rule 137 addresses the pleadings, motions and other papers a litigant files, the rule does not provide a sanction against all asserted instances of bad-faith conduct by a litigant or the litigant's attorney during the course of litigation. [Citation.] *** We discern no reason why a prevailing defendant should be limited by Rule 137 in establishing a plaintiff's bad faith. Rule 137, and the body of case law that has developed around it, provide useful guidance to litigants and judges, but a defendant's failure to demonstrate bad faith by the plaintiff under Rule 137 is not fatal to a prevailing defendant's fee petition under the Act." *Id*. at 562.

¶ 99    I construe *Krautsack* as holding that the standard for determining a party's bad faith in maintaining suit that would justify an award of statutory fees is (1) whether the pleadings, motions and other papers which were filed by the party violated Rule 137 or (2) whether the party's other conduct during the course of the litigation ran afoul of the underlying purpose of Rule 137, which is "to prevent abuse of the judicial process by penalizing claimants who bring vexatious and harassing actions" or violated other court rules. (Internal quotation marks omitted.)

*Id*. at 561.  In determining whether bad faith exists in a given case, the trial court may consider and be guided by the body of case law construing Rule 137, but is not constrained by Rule 137. *Id*. at 562.  Thus, I am not saying, in any way, that the *Krautsack* standard of bad faith is "coterminous" or stops with Rule 137 as suggested *supra* ¶¶ 39-42.

¶ 100    As our supreme court has articulated guidelines for determining bad faith in the award of statutory fees to a prevailing party, I believe these guidelines should be followed in the determination of bad faith under section 5 of the Act.  See *People v. Bingham*, 2014 IL 115964, ¶ 42 (holding that, when a statute is unclear, a court may look to similar statutes as an aid to construction); *Midwest Rem Enterprises, Inc. v. Noonan*, 2015 IL App (1st) 132488, ¶ 89 (where court, in considering fee provision in the Citizen Participation Act (735 ILCS 110/25 (West 2010)), looked "to precedent involving other statutes that permit the award of fees to a successful party").

¶ 101    The fee request was argued before the trial court under the California two-prong test for bad faith in *SASCO*, instead of under the Illinois's preexisting test for defining "bad faith" as discussed in *Krautsack*.  The trial court, in denying the fee request, referenced "bad faith" and "frivolous," but not "speciousness."  It is, thus, not clear to me exactly what standard the trial court applied.  Therefore, I would vacate the order denying iCONN's motion for attorney fees. Further, because the trial court is in the best position to consider whether an award of fees is appropriate, I suggest the fee issue be remanded to the trial court to allow it an opportunity to consider whether iCONN, as a prevailing party, made a sufficient showing of bad faith on the part of Conxall as that term has been defined by our state courts and articulate its findings under that standard.

¶ 102   In doing so, I understand that the able trial court, who had firsthand knowledge of this case and observed the witnesses and the presentation of evidence, did find that there was no bad faith under the arguments that were presented by the parties.  Further, I do not find, nor even suggest, that the trial court's findings that iCONN had not shown Conxall acted in bad faith and that the claims were not frivolous and its denial of iCONN's fee request under section 5 were in error, only that the parties presented the wrong test for bad faith to the trial court and that it is not apparent from the record what standard was applied by the trial court.  And, as I have stated, I do not agree that the trial court may or should be guided by the discussion set forth *supra* ¶¶ 44-82, which is done under the *SASCO* standard and which is described above (*supra* ¶ 38) as *less* strict. It is my belief that this discussion does not give the deference that is due to the trial court in determining whether a fee award is appropriate and may invade the trial court's province to determine credibility.

¶ 103   JUSTICE HOFFMAN, concurring in part and dissenting in part.

¶ 104   I concur with Justice Delort's conclusion that the trial court's decision to give instruction No. 18 to the jury was not an abuse of discretion.  I base my conclusion in this regard upon a firm belief that, taken as a whole, the instructions that the court gave fully instructed the jury on the relevant legal principles necessary to a resolution of the case, and the giving of instruction No. 18 neither misled the jury nor prejudiced Conxall.

¶ 105   For the reasons stated in Justice Delort's opinion, I also agree that Conxall forfeited any objection to special interrogatory No. 4 by making only a general objection before the trial court and that the jury's answer to special interrogatory No. 4 is not against the manifest weight of the evidence.

¶ 106   Consequently, I too vote to affirm the judgment in favor of the defendants and the denial of Conxall's posttrial motion.

¶ 107   I disagree, however, with both of my colleagues on the resolution of iCONN's cross-appeal.  Justice Delort proposes the adoption of a two-prong test consisting of objective speciousness and subjective bad faith for determining bad faith under section 5 of the Illinois Trade Secrets Act (Act) (765 ILCS 1065/5 (West 2012)).  Justice Delort has cited cases decided by the California Appellate Court in support of his proposed test.  However, as was observed by the Superior Court of Pennsylvania, although the two-prong test for determining bad faith in a trade secrets case has been widely adopted by federal district courts throughout the country, it has not been implemented by a reviewing court in any state other than California.  *Krafft v. Downey*, 68 A.3d 329, 334-36 (Pa. Super. Ct. 2013).  As the *Krafft* court noted, the only uniformity among the states such as Illinois that have adopted the Uniform Trade Secrets Act is that they determine "bad faith" by applying their own preexisting test for defining bad faith.  *Krafft*, 68 A.3d at 336.

¶ 108   I agree with Presiding Justice Rochford's analysis as to the proper standard that a trial judge should employ in determining bad faith under section 5 of the Act.  The trial judge should be guided by cases construing Illinois Supreme Court Rule 137 (eff. July 1, 2013) and which define bad faith consistent with the underlying purpose of Rule 137.  Where I disagree with Presiding Justice Rochford is on the need to remand this matter to the trial court for a rehearing on the issue of iCONN's entitlement to an award of fees.

¶ 109   The record establishes that the trial court conducted a hearing on iCONN's motion for an award of fees, following which the trial court entered its order denying the motion and finding that Conxall's claims were not frivolous and not brought in bad faith.  I find nothing in the

record establishing that the trial judge did not apply the standards that both Presiding Justice Rochford and I have held appropriate; namely, an application of the analysis of Illinois reviewing courts that have defined bad faith in a manner consistent with the underlying purpose of Rule 137. Further, from a factual standpoint, I cannot say that the trial court erred in finding that sufficient circumstantial evidence exists supporting its conclusion that Conxall's claims were neither frivolous nor brought in bad faith. For these reasons, I am unable to find an abuse of discretion in the trial court's denial of iCONN's motion for an award of attorney fees and would, therefore, affirm its judgment in that regard.

¶ 110   Justice Delort devotes 21 pages of a 33 page opinion to detail his "view of the evidence and to guide the trial court on remand." *Supra* ¶ 33. On the issue of the standard that the trial court should employ on remand when it reconsiders iCONN's motion for an award of fees, I fail to see what guidance Justice Delort's opinion gives in light of the fact that a majority of this panel has rejected the test for bad faith that he proposed. Further, our view of the evidence, either supporting or opposing an award of fees, is wholly irrelevant. As stated earlier, I would affirm the order denying iCONN's motion for an award of fees, but I am not in the majority on that issue. Rather, the majority has vacated the circuit court's order and remanded the matter for a new hearing on the motion for fees. Whether the trial court grants or denies the motion for fees on remand is a matter committed to its sound discretion, unencumbered at this juncture by our "view of the evidence." Had Justice Delort dissented from the denial of iCONN's motion for an award of fees, his "view of the evidence" would certainly be relevant. However, having voted to vacate the trial court's judgment and remand the matter back to the trial court for reconsideration, the 17 pages which Justice Delort has devoted to his "view of the evidence" serves no purpose other than as an attempt to influence the trial judge's decision on remand.

There is time enough for the members of this court to express their views of the evidence after the trial court has issued its order on remand and the question of its propriety is properly before us.