2025 IL App (1st) 230519-U

No. 1-23-0519

Order filed April 28, 2025.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* COMMITMENT OF MINOSA ECHOLS | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
|    Petitioner-Appellee, | ) | |
| | ) | |
|   v. | ) | No. 17 CR 80003 |
| | ) | |
| Minosa Echols, | ) | The Honorable |
| | ) | Tyria B. Walton, |
|    Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Respondent's civil commitment as a sexually violent person is affirmed, where the evidence at trial supported the judgment and no errors occurred in the court's evidentiary rulings, the State's closing arguments, or the instructions given to the jury.

¶ 2    Following a jury trial, respondent Minosa Echols was found to be a sexually violent person

(SVP) and committed to the Department of Human Services (DHS) pursuant to the Sexually

Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2016)). On appeal, he asserts that the State failed to prove he was an SVP, as the evidence at trial did not show that he had a qualifying mental disorder under the Act, or that a mental disorder made it substantially probable he would engage in acts of sexual violence. Respondent also argues that reversal is warranted based on the cumulative effect of multiple errors made in the trial court's evidentiary rulings, the State's closing arguments, and the instructions given to the jury. We affirm.

¶ 3                                  I. Background

¶ 4                          A. The State's SVP Petition

¶ 5      On May 12, 2017, the State filed a petition to commit respondent as an SVP under the Act based on his mental disorder and probability of reoffense, after respondent was convicted of aggravated criminal sexual assault in a 2009 case and imprisoned for 10 years in the Illinois Department of Corrections (IDOC), where he still remained. The State attached an evaluation completed by forensic psychologist Dr. Vasiliki Tsoflias, dated April 20, 2017. Dr. Tsoflias diagnosed respondent with other specified paraphilic disorder, in that he was sexually attracted to nonconsenting females, (os-paraphilic disorder (nonconsent)) and with other specified personality disorder with antisocial traits (os-personality disorder (antisocial)). She opined that respondent had a substantial and continuing risk for sexual offense recidivism and therefore recommended a finding that respondent was an SVP under the Act.

¶ 6                          B. Pretrial Litigation

¶ 7      Following a hearing on June 20, 2017, the trial court found there was probable cause to believe that respondent was an SVP and ordered respondent's detention at a DHS-approved facility.

¶ 8     Prior to trial, respondent filed a motion *in limine* to provide a nonpattern limiting instruction, based on Washington Pattern Jury Instruction 365.03 (hereinafter, WPI 365.03), to the jury regarding the factual bases of the opinions of Dr. Tsoflias and licensed clinical psychologist Dr. Edward Smith. He asserted that the applicable pattern instruction, Illinois Pattern Jury Instructions, Civil, No. 2.04 (2016) (hereinafter, IPI Civil (2016)), failed to adequately explain that the factual bases for a witness's opinion may not be considered to be true, and can only be considered in evaluating the weight to give to the opinion. The trial court denied respondent's motion, finding that IPI Civil (2016) No. 2.04 adequately stated the law.

¶ 9     The State also filed a motion *in limine* requesting, in relevant part, that respondent be precluded from offering any testimony or argument that sought to challenge the quality of sex offender treatment at the DHS Treatment and Detention Facility (TDF). The State argued in court that the treatment was irrelevant because respondent did not receive treatment, and any attack on the TDF would be "confusing and prejudicial." The court granted the motion.

¶ 10                                    C. Jury Trial

¶ 11                                    1. Trial Testimony

¶ 12                                    a. The State's Experts

¶ 13    The trial took place in October 2022. The State called Drs. Tsoflias and Smith, who both opined that respondent suffered from qualifying mental disorders under the Act, namely, os-paraphilic disorder (nonconsent) and os-personality disorder (antisocial), and that respondent was an SVP.

¶ 14    Drs. Tsoflias and Smith each attempted to interview respondent, but respondent refused. They were nonetheless able to complete their evaluations based on a document review. The State's

experts relied on police reports and court documents from previous offenses, respondent's criminal history, IDOC and DHS records, medical records, and psychological evaluations. During both experts' testimony, the trial court admonished the jury based on IPI Civil (2016) No. 2.04, explaining that testimony regarding the documents could not be considered as evidence. Rather, the testimony was offered for the limited purpose of informing the jury on the bases of the experts' opinions, so that they could decide the opinions' weight.

¶ 15    The experts both described respondent's prior sexual offenses, as set forth here.

¶ 16    A 1979 police report from a dismissed case stated that respondent was arrested after hitting a woman with a bottle and vaginally raping her in a car. Documents from a separate 1980 court case reflected that respondent was charged, but acquitted, for detaining a woman, hitting her with a brick, and vaginally raping her. Records from a stricken 1987 case stated that respondent was charged with battery for forcing a female into his car at knifepoint and vaginally raping her.

¶ 17    In a 1998 court case, respondent was convicted of attempted aggravated criminal sexual abuse and sentenced to 13 months in prison, after he pulled a 12-year-old family member into his car, got on top of the minor while clothed, "pump[ed] up and down," got off of her, and then "rubbed his private part." A 2002 police report reflected that respondent was arrested for a 1999 incident in which he forced a 14-year-old girl into his car at gunpoint and vaginally raped her. Respondent was not charged because the victim could not be found when he was arrested.

¶ 18    In a 2002 case, respondent was convicted of aggravated criminal sexual abuse and sentenced to six years in prison, after he picked up a 15-year-old girl in his car and vaginally raped her. Respondent was paroled in 2004. In 2005, however, he was found in violation of parole for failing to disclose his location and attend sex offender treatment. In a 2009 case, respondent was

convicted of aggravated criminal sexual assault and sentenced to 10 years in prison after he ordered a woman into his car at gunpoint, drove away, and vaginally raped her.

¶ 19    Based on respondent's history of sexual offenses, Dr. Tsoflias observed a pattern in which respondent approached female victims, had them enter his car, drove them to an isolated area, threatened them, and vaginally raped them. From 1979 to 2009, respondent was also arrested for over 20 nonsexual offenses, including battery, aggravated assault, theft, and driving a stolen vehicle. Six of the offenses resulted in convictions.

¶ 20    During his most recent incarceration in the IDOC, respondent received five disciplinary tickets, including one for fighting and another for assaulting an inmate. During respondent's five years in the TDF, respondent received four disciplinary tickets, including one in 2018 for assaulting his roommate and another in 2021 after he told authorities "the situation would end in violence" if they did not remove his roommate. Dr. Tsoflias acknowledged on cross-examination that respondent had not been cited for sexual misconduct in the IDOC or TDF, even though in the TDF he was allowed to move around without handcuffs, he worked as a janitor there, and he had female supervisors.

¶ 21    Turning to respondent's diagnosis of os-paraphilic disorder (nonconsent), the State's experts explained that paraphilia is a sexual arousal and interest in something other than "typically sexual behavior," *i.e.*, age-appropriate, healthy, and consensual relationships. A paraphilia becomes a disorder once it causes an individual distress or problems in daily functioning, or it causes harm or the risk of harm to others. The Diagnostic and Statistical Manual of Mental Disorders (DSM) lists nine examples of paraphilic disorders but was not exhaustive. The DSM did

not expressly list a paraphilic disorder based on nonconsent, not because there was disagreement that the disorder exists but because there was no agreement on the disorder's criteria.

¶ 22    Dr. Tsoflias stated that respondent's diagnosis of os-paraphilic disorder (nonconsent) applies where someone is sexually aroused by engaging in sexual acts with nonconsenting partners. Generally, the first criterion for a paraphilic disorder is that, for a period of at least six months, the person has to experience intense and persistent sexual urges, fantasies, or engage in sexual behavior, as in this case, related to nonconsenting females. The second criterion is that the person is either distressed by the fantasies or urges, or acts on the behavior and causes harm to the women.

¶ 23    Here, respondent had engaged in sexual acts with nonconsenting females for about 30 years. Respondent still suffered from the condition because paraphilic disorders tend to be chronic. As such, typical treatment was aimed toward teaching how to manage sexual urges and helping to create "healthy sexual arousal." Drs. Tsoflias and Smith noted that respondent was currently in a "controlled environment" where he was monitored and his movement was limited. Dr. Tsoflias added that, under these conditions, people are typically less likely to act on urges. Because respondent had previously sexually offended months after his release from prison, his lack of sexual offenses in a controlled environment did not indicate how he would act in the community.

¶ 24    Turning to respondent's other diagnosis, os-personality disorder (antisocial), Dr. Tsoflias explained that a personality disorder means that the person behaves or thinks in a way that impacts their life or their ability to function within societal norms. Dr. Smith described it as interactions with an environment that tend to deviate from societal norms and what is expected in a person's culture. An antisocial personality disorder focuses on "somebody's violation of the rights of others

and not following the rules of society." Drs. Tsoflias and Smith both diagnosed respondent with os-personality disorder with antisocial traits.

¶ 25    Dr. Tsoflias testified that respondent exhibited four antisocial traits: (1) repeated unlawful behaviors; (2) irritability or aggressiveness; (3) impulsivity without appreciating the consequences of actions; and (4) reckless disregard for the safety of self and others. The experts knew respondent still had the disorder because it's chronic and lasts a lifetime. Dr. Tsoflias found respondent's TDF disciplinary tickets significant because they showed respondent had behavioral issues even in a controlled environment. It was also significant that respondent still engaged in both sexual and physical assaults after age 40, when antisocial behaviors tend to decrease.

¶ 26    Dr. Tsoflias testified that respondent's disorders together predisposed him to engage in acts of sexual violence. His paraphilic disorder gave him urges to engage in sexual acts with nonconsenting people, and his antisocial traits made him more likely to act on those urges. His history of crime and impulsivity showed he was not deterred by criminal penalties and had a history of not caring for others.

¶ 27    Turning to risk assessment, the State's experts opined that there was a substantial probability respondent would reoffend. Dr. Smith explained that comparing respondent to others was part of the risk assessment component of the evaluation. The process involved an "adjusted actuarial approach," in which the evaluator went through a list of characteristics shown to indicate a likelihood of reoffending. The evaluator then scored the subject individual based on how many of those characteristics the individual had. The experts used two actuarial instruments: the Static-99R and Static-2002R.

¶ 28    Using the Static-99R, respondent received a score of 4. This indicated he was in an above average risk category and 1.94 times more likely than a typical sex offender to reoffend. Using the Static-2002R, respondent received a score of 5, indicating he was in an above average risk category and 1.9 times more likely to reoffend than a typical sex offender. Respondent's scores on both instruments were originally higher but decreased when he turned 60. Dr. Tsoflias stated that the instruments' results were "underestimates" because most sex offenses are not reported. The scores were a starting point, and an evaluator also looked at other factors.

¶ 29    Dr. Tsoflias found respondent exhibited dynamic risk factors, which indicated a risk of reoffending that could be decreased with treatment. These factors were (1) a preference for sexualized violence even when respondent had a consenting sexual partner at home; (2) a lack of emotionally intimate, adult relationships; (3) poor cognitive problem solving; and (4) resistance to rules and supervision. Dr. Tsoflias testified that respondent also exhibited case-specific risk factors that increased risk of reoffense, *i.e.*, hostility toward women and lack of remorse. Dr. Smith additionally observed respondent had a deviant sexual interest, a personality disorder, general self-regulation problems, and negative social influences based on reports of respondent's prior involvement in gang activity.

¶ 30    The experts also examined whether respondent exhibited any protective factors that decrease the risk of reoffending. They found that (1) his age and health suggested he would likely live long enough to reoffend without difficulty; (2) he had not spent a significant period of time being offense-free in the community; and (3) respondent had not engaged in any sex offender treatment program in the IDOC or TDF. Dr. Tsoflias clarified on cross that respondent's choice to decline treatment wouldn't affect his reoffense risk, but it "just wouldn't decrease" the risk. Dr.

Smith found respondent's age somewhat reduced his reoffense risk, but not below a substantial probability. He also explained that sex offender treatment would have helped respondent review his offending history and identify things that triggered his cycle.

¶ 31                                       b. Respondent's Expert

¶ 32    Respondent called clinical forensic psychologist Luis Rosell, Ph.D., who was appointed by the court to evaluate respondent in 2018. He also evaluated respondent based solely on his records. The court again admonished the jury based on IPI Civil (2016) No. 2.04.

¶ 33    Dr. Rosell opined that respondent was not an SVP under the Act because respondent's mental disorder did not make him substantially probable to reoffend. Dr. Rosell diagnosed respondent with os-personality disorder (antisocial) based on his history of antisocial behavior. Dr. Rosell nonetheless did not find respondent had a mental disorder under the Act because respondent was older and thus less likely to continue "this specific type of sexual violence." Dr. Rosell believed respondent's antisocial conduct had "dissipated greatly." Had he evaluated respondent in 2009 when respondent was younger, however, he would have considered it "very likely" that respondent had a mental disorder under the Act.

¶ 34    Dr. Rosell continued that most of respondent's sex offense convictions occurred when respondent was ages 38 to 46, and his last offense occurred at 47 in 2006. Over the last 13 or 14 years in confinement, respondent hadn't engaged in behaviors like those that landed him in prison. His last violent acts occurred in 2018 and 2019: respondent hit a person, and another "situation ensued" because a roommate walked around without clothes. According to Dr. Rosell, respondent currently did not display arousal to sexual activity with nonconsenting people. Dr. Rosell acknowledged on cross that he was "not sure" if respondent's current confinement allowed him to

act on his prior pattern, but respondent probably couldn't access a gun or move female staff to a secluded area.

¶ 35    Dr. Rosell didn't consider diagnosing respondent with os-paraphilic disorder (nonconsent) because it wasn't specifically listed in the DSM, though he also acknowledged that the DSM's list of paraphilic disorders was not exhaustive. He stated that in 2012, a diagnosis for "paraphilic coercive disorder" had been proposed for the DSM 5th edition but was rejected. Dr. Rosell further questioned the diagnosis and didn't believe it existed because there were no specific criteria for diagnosing it. He stated research showed that individuals interested in consensual versus non-consensual sex could not be distinguished, as a "great majority" of people who commit rape want consent. Dr. Rosell acknowledged, however, that clinicians regularly used the diagnosis os-paraphilic disorder (nonconsent).

¶ 36    In assessing respondent's reoffense risk, Dr. Rosell used the Static-99R. Respondent received a score of 4, indicating a 6.7% risk of reoffending. Respondent's score was reduced from 7 when he turned 60. Dr. Rosell didn't use any other actuarial instruments, including the Static-2002R because of a lack of updates since 2016. He also did not consider any dynamic risk factors because a 2010 article stated most of the factors did not strongly correlate with sexual recidivism. "Additional research" showed that dynamic risk factors only increased risk by 1 or 2%. Respondent's lack of sex offender treatment in the TDF did not affect Dr. Rosell's opinion because, according to Dr. Rosell, treatment was optional and its effect on recidivism rates was "not as significant as you may believe." He stated that those who completed treatment had an 11% recidivism rate, compared to a 19% recidivism rate for those who had not.

¶ 37    On cross, Dr. Rosell acknowledged that a Static-99R score of 4 is an above average risk. He further acknowledged that the Static-99R's authors direct evaluators to consider external factors outside the static scores. Dr. Rosell had only looked at age and the Static 99R. He did not consider external factors because "they do not increase the person's risk percentage much more." He believed respondent's hostility toward women was "[c]learly in the past." He stated on redirect examination that he also considered respondent's behavior over the last 13 years but saw nothing concerning.

¶ 38                                                    3. Verdict

¶ 39    For the sake of brevity, we analyze the relevant details of the closing arguments and jury instructions in the analysis section.

¶ 40    Following evidence, argument, and instructions, the jury found that respondent was an SVP under the Act. Following a disposition hearing, the trial court committed respondent to the DHS for further treatment, care, custody, and control, finding respondent was not appropriate for discharge or conditional release. Respondent appealed.

¶ 41                                                  II. Analysis

¶ 42                                        A. Sufficiency of the Evidence

¶ 43    On appeal, respondent first argues that the State failed to prove beyond a reasonable doubt that he qualifies as an SVP under the Act. He asserts the State failed to prove that he has a qualifying mental disorder or that he is dangerous because a mental disorder makes it substantially probable that he will engage in acts of sexual violence.

¶ 44    The Act authorizes the involuntary civil commitment of SVPs for control, care, and treatment. *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 48. Proceedings under the Act are

civil in nature. *In re Detention of Samuelson*, 189 Ill. 2d 548, 553 (2000). At a trial on the merits, however, all rules of evidence in criminal actions apply, as do all constitutional rights available to a defendant in a criminal proceeding. *Id.*

¶ 45    When reviewing challenges to the sufficiency of the evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt. *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. Because the trier of fact is responsible for resolving conflicts in the evidence and for determining the credibility of the witnesses and the weight to be given particular testimony, we may not substitute our judgment for that of the trier of fact. *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 43. Further, we will not reverse a jury's SVP determination unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt. *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 56.

¶ 46    An SVP is defined to include "a person who has been convicted of a sexually violent offense *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2016). To establish that a respondent is an SVP, the State must prove beyond a reasonable doubt that (1) respondent was convicted of a sexually violent offense; (2) he has a mental disorder; and (3) the mental disorder makes it substantially probable that he will engage in further acts of sexual violence. *Fields*, 2014 IL 115542, ¶ 20; 725 ILCS 207/5(f), 35(d) (West 2016). Here, respondent argues that the State did not prove the last two of these elements, namely, that he has a qualifying mental disorder, and that the mental disorder makes it substantially probable that he will engage in acts of sexual violence. We review each element separately.

¶ 47                                    1. Qualifying Mental Disorder

¶ 48    The Act defines a "mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2016). The Act does not exclude any specific psychological condition from the definition of a "mental disorder," and the term "condition" is not limited to single, standalone disorders defined in the DSM. *White*, 2016 IL App (1st) 151187, ¶ 46.

¶ 49    In determining whether the State has met its burden in showing the respondent has a mental disorder, this court has "routinely relied on expert testimony, and deferred to the factfinder's determinations regarding an expert's credibility." *Moody*, 2020 IL App (1st) 190565, ¶ 48. "While a prior sexually violent offense is not sufficient to establish that a person has a mental disorder, experts are not prohibited from relying on the underlying behaviors manifested during prior offenses in the diagnosis of a particular mental disorder." *White*, 2016 IL App (1st) 151187, ¶ 59. An expert's diagnosis of a mental disorder may also be based on a respondent's sexual or nonsexual behavioral history, even if it did not result in a conviction. *In re Commitment of Moore*, 2023 IL App (5th) 170453, ¶ 85. The factfinder "has the ultimate responsibility to assess how probative a particular diagnosis is on the legal question of the existence of a 'mental disorder'; the status of the diagnosis among mental health professionals is only a step on the way to that ultimate legal determination." (Emphasis and internal quotation marks omitted.) *White*, 2016 IL App (1st) 151187, ¶ 42. It is not the reviewing court's role to determine whether a particular diagnosis satisfies the State's burden. *In re Commitment of Montilla*, 2022 IL App (1st) 200913, ¶ 110.

¶ 50    We find the State met its burden to prove respondent has a mental disorder under the Act. Here, the State's two experts, Drs. Tsoflias and Smith, diagnosed respondent with os-paraphilic

disorder (nonconsent) and os-personality disorder (antisocial) and opined that respondent has a qualifying mental disorder. They based their opinions on respondent's pattern of behavior, which was gleaned from his criminal and behavioral histories. From respondent's criminal records, they observed a behavioral pattern from 1979 to 2009, in which respondent would use force or threat of force to move females into secluded areas in order to force nonconsensual sex with them. See *White*, 2016 IL App (1st) 151187, ¶ 59.

¶ 51    Drs. Tsoflias and Smith also based their opinions on respondent's behavioral history in the IDOC and TDF, as they observed respondent had received disciplinary tickets, some of which involved reports of violence and aggression. The experts considered respondent's behavioral history as indicative that respondent continued to exhibit aggression, impulsivity, and a disregard for the safety and rights of others, which were antisocial traits consistent with his personality disorder. See *Gavin*, 2019 IL App (1st) 180881, ¶¶ 37-38.

¶ 52    We disagree with respondent that Drs. Tsoflias and Smith failed to explain how respondent's diagnoses constitute a mental disorder under the Act. The experts testified that respondent has urges and a preference for committing acts of sexual violence with nonconsenting females. Dr. Tsoflias noted that respondent sought nonconsensual sex even at times when he was in a long-term relationship and thus had consensual sex available to him. Additionally, the State's experts observed that respondent's antisocial traits, *i.e.*, his lack of self-control and disregard for others' rights and safety, predisposed him to commit acts of sexual violence. Drs. Tsoflias and Smith agreed that respondent's two diagnoses together qualified as a mental disorder under the Act. The experts more than sufficiently explained how respondent's diagnoses were a qualifying mental disorder under the Act, as they explained how respondent's condition affected his

emotional or volitional capacity and predisposed him to engage in acts of sexual violence. 725 ILCS 207/5(b) (West 2016); see *White*, 2016 IL App (1st) 151187, ¶¶ 42-43, 48 (the respondent's os-paraphilic disorder (nonconsent) and os-personality disorder (antisocial) together were a qualifying mental disorder, based on expert testimony that the paraphilic disorder "drove his deviant sexual behavior" and his personality disorder showed he "did not care about the rights or safety of others").

¶ 53 While respondent's expert, Dr. Rosell, personally questioned whether os-paraphilic disorder is a valid diagnosis and noted its absence from the DSM, he also acknowledged that the DSM is not exhaustive and that os-paraphilic disorder is a regularly used diagnosis. The jury was free to reject Dr. Rosell's testimony challenging the validity of the diagnosis of os-paraphilic disorder (nonconsent), which this court has found constitutes a qualifying mental disorder under the Act. See *In re Commitment of Butler*, 2022 IL App (1st) 201107, ¶ 34.

¶ 54 Ultimately, the jury found Drs. Tsoflias and Smith testified credibly that respondent had a mental disorder, where the State's experts thoroughly supported their opinions with observations of respondent's criminal and behavioral histories. It is not the role of this court to substitute our judgment for that of the jury, as respondent essentially asks that we do. See *Moody*, 2020 IL App (1st) 190565, ¶ 43. We find that a reasonable factfinder could have concluded that respondent had a qualifying mental disorder.

¶ 55                                     2. Substantial Probability

¶ 56 We also find the evidence was sufficient to show respondent's mental disorders make it substantially probable that he will engage in further acts of sexual violence. "Substantially probable" in this context means much more likely than not. *In re Detention of Bailey*, 317 Ill. App.

3d 1072, 1086 (2000). This definition cannot be reduced to a "mere mathematical formula or statistical analysis." *In re Detention of Hayes*, 321 Ill App. 3d 178, 188 (2001). Rather, the trier of fact applies "commonsense judgment" based on all factors that either increase or decrease the risk of reoffending. (Internal quotation marks omitted.) *Gavin*, 2024 IL App (1st) 230246, ¶ 44. "We do not require any specific, precise, or exact testimony to find that an expert sufficiently made the connection between respondent's mental condition and risk of reoffense." *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 76.

¶ 57    Here, the evidence was sufficient to show that respondent is much more likely than not to commit future acts of sexual violence if released, based on his diagnosed mental disorders, the actuarial instrument results, and dynamic risk factors. First, the State's experts, Drs. Tsoflias and Smith, both testified that respondent's diagnoses, os-paraphilic disorder (nonconsent) and os-personality disorder (antisocial), tend to be chronic and do not go away. They observed respondent's reoffense cycle showed he repeatedly committed sexually violent offenses each time he was released from prison, causing him to be reincarcerated. See *Montilla*, 2022 IL App (1st) 200913, ¶ 121. As stated, the State's experts also observed that respondent's IDOC and TDF disciplinary history indicated respondent was aggressive, impulsive, and had difficulty regulating his behavior even in a controlled environment. They noted that respondent continued to receive disciplinary tickets, some reflecting violence and aggression towards inmates.

¶ 58    Second, Drs. Tsoflias and Smith also relied on two actuarial instruments, the Static-99R and Static-2002R, in evaluating respondent's risk of reoffending. Dr. Tsoflias emphasized that the instruments' results are typically seen as "underestimates" because most sex offenses are not reported. According to the State's experts, respondent was placed in an "above average" risk

category. He received a score of 4 on the Static-99R and a score of 5 on the Static-2002R, respectively indicating he was 1.94 and 1.9 times more likely than a typical offender to reoffend. Respondent's own witness gave him a score of 4 on the Static-99R. See *In re Commitment of Conley*, 2023 IL App (1st) 211084, ¶¶ 47-48.

¶ 59    The State's experts also considered a number of dynamic risk factors, including a preference for sexualized violence, a lack of emotionally intimate relationships with adults, poor cognitive problem-solving, resistance to rules and supervision, "deviant sexual interest," and negative social influences. Dr. Tsoflias found that any potential protective factors decreasing the risk of reoffense were not present because respondent's age and health would not prevent him from reoffending, he had not spent a significant period of time without reoffending, and he had not received sex offender treatment. See *Montilla*, 2022 IL App (1st) 200913, ¶ 120 (also relying on dynamic risk factors in assessing reoffense risk).

¶ 60    Drs. Tsoflias and Smith saw respondent's diagnoses to be an ongoing concern despite his lack of sexual misconduct while in the controlled environment of the TDF. They noted, for example, that it would have been difficult for respondent to successfully force female staff into a secluded area to force nonconsensual sex with them. Because respondent had consistently reoffended soon after being released from prison, his behavior in the TDF was not indicative of how he would behave in the community going forward. This testimony contradicted that of respondent's own expert, who opined that respondent was not likely to reoffend because he had not committed any sexual misconduct in the last 13 or 14 years. The jury still could have found respondent to be an SVP, however, despite having not committed any sexual offenses in recent years. See *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 601-02 (2007) (evidence sufficient

for SVP determination even after no evidence of nonconsensual sexual activity in 26 years, where the respondent was incarcerated in a controlled environment). The fact that Dr. Rosell disagreed with Drs. Tsoflias's and Smith's opinions that it is substantially probable respondent would reoffend is not sufficient for us to conclude that the State failed to meet its burden of proof. See *Montanez*, 2020 IL App (1st) 182239, ¶ 70 (affirming finding that the respondent was an SVP despite fact that his expert disagreed with the State's experts).

¶ 61    Taken together, the State's expert testimony, which based on respondent's history of sexual violence and impulsive behavior, his risk assessment results, and his continuous reoffending when released into the community, all supported the jury's finding that respondent had a present mental condition making it substantially probable respondent would engage in further acts of sexual violence. See *In re Commitment of Adams*, 2021 IL App (1st) 182049, ¶¶ 60-61 (the respondent's diagnosis of os-paraphilic disorder (nonconsent) and personality disorder made it substantially probable the respondent would engage in future acts of sexual violence, based on the respondent's history of sexual violence, risk assessment results, and predisposition); *Montanez*, 2020 IL App (1st) 182239, ¶¶ 74-76.

¶ 62    It was the jury's role as the trier of fact to determine the credibility of the parties' experts and the weight to give to the evidence, and we cannot substitute our judgment for that of a trier of fact. *Moody*, 2020 IL App (1st) 190565, ¶ 43. Nor can we say that the jury's SVP determination was so improbable or unsatisfactory as to be reversible. *White*, 2016 IL App (1st) 151187, ¶ 56. As such, we conclude that the evidence was sufficient to prove beyond a reasonable doubt that respondent qualifies as an SVP under the Act.

¶ 63                                B. Evidentiary Rulings

¶ 64    Respondent next disputes two separate evidentiary rulings made by the trial court: (1) the court's overruling respondent's objections to testimony concerning the risk relative to other sex offenders and (2) the court's granting the State's motion *in limine* to prevent respondent from submitting testimony or argument challenging the quality and effectiveness of sex offender treatment in the TDF.

¶ 65    First, respondent argues that the State's experts were improperly allowed to testify that, according to the Static-99R and Static-2002R results, respondent was respectively 1.94 and 1.9 times more likely to reoffend compared to a typical sex offender. He asserts that this testimony was irrelevant and substantially more prejudicial than probative.

¶ 66    We disagree. This testimony explained how "above average" respondent's reoffense risk was compared to that of other sex offenders. This was relevant to analyze whether respondent was substantially probable to commit further acts of sexual violence. See Ill. R. Evid. 401 (eff. Jan. 1, 2011) ("Relevant evidence" means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). We also reject respondent's characterization that the testimony was more prejudicial than probative. This court has on multiple occasions recognized this exact type of testimony as proper evidence supporting a finding that a respondent is an SVP. See, *e.g.*, *Conley*, 2023 IL App (1st) 211084, ¶¶ 47-48; *In re Commitment of Evans*, 2021 IL App (1st) 192293, ¶ 49; *Moody*, 2020 IL App (1st) 190565, ¶ 63. We therefore cannot find the circuit court abused its discretion in allowing the testimony regarding respondent's risk of reoffense relative to other offenders. *In re Detention of Melcher*, 2013 IL App (1st) 123085, ¶ 42 (abuse of discretion standard).

¶ 67    Respondent also claims the trial court erred in granting the State's motion *in limine* to bar respondent from challenging the quality or effectiveness of sex offender treatment at the TDF.

¶ 68    The record shows that all three experts testified consistently that receiving sex offender treatment was shown to decrease the risk of reoffending. Respondent was permitted to elicit testimony from Dr. Rosell that this decrease was not "significant." Yet respondent did not actually receive sex offender treatment at the TDF, and so the effectiveness of the TDF's treatment service for respondent was not at issue. Thus, any testimony regarding the general quality of the TDF's treatment would have been marginally relevant at best and risked confusing the issues at trial, which centered around whether respondent was an SVP. See *People v. Lewis*, 2017 IL App (1st) 150070, ¶ 21 (fairness does not require the admission of evidence which is "marginally relevant" or which "poses an undue risk of *** confusion of the issues" (internal quotation marks omitted)). We therefore cannot find that the trial court abused its discretion in precluding respondent from challenging the general quality and effectiveness of the TDF's sex offender treatment. *Morgan*, 2025 IL 130626, ¶ 23.

¶ 69                            C. Closing Arguments

¶ 70    Respondent next argues that the State made a number of improper comments in closing and rebuttal. Respondent asserts that even if he failed to preserve some of these alleged errors, they were nonetheless reviewable under the plain error doctrine. Relief under the plain error doctrine is warranted where (1) the evidence is closely balanced; or (2) the error is so serious that it affected the fairness of the trial and challenged the judicial process's integrity. *People v. Bush*, 2023 IL 128747, ¶ 71. Here, respondent asserts first prong plain error applies to the unpreserved

claims. When applying the plain error doctrine, we first determine whether error occurred because, without error, there can be no plain error. *People v. Hood*, 2016 IL 118581, ¶ 18.

¶ 71 Prosecutors are afforded wide latitude during closing arguments. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). During closing arguments, the prosecutor may comment on the evidence presented, or any reasonable inferences drawn from the evidence, and respond to remarks by defense counsel that clearly invite response. *People v. McAndrew*, 2024 IL App (1st) 230881, ¶ 58. Remarks made during closing arguments must be examined in the context of those made by both the prosecution and defense, and must always be based upon the evidence presented or reasonable inferences drawn therefrom. *People v. Cook*, 2018 IL App (1st) 142134, ¶ 61. We consider the closing argument as a whole, rather than focusing on selected phrases or remarks. *People v. Jackson*, 2020 IL 124112, ¶ 82.

¶ 72 This court has noted an apparent split in the appellate court regarding whether the *de novo* or abuse of discretion standard applies when reviewing allegations of prosecutorial misconduct during closing. See *People. v. Cornejo*, 2020 IL App (1st) 180199, ¶ 125. Our supreme court has recently stated that the applicable standard of review "is similar to the standard used in deciding whether a prosecutor committed plain error." *Jackson*, 2020 IL 124112, ¶ 83. Specifically, we will find reversible error "only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Id.*

¶ 73 Respondent first asserts that the State improperly urged the jury in closing to tell respondent to "do the treatment" and argued in rebuttal that respondent "hasn't done anything while at the treatment and detention facility in the past 13 years." As respondent notes, the court allowed this argument while sustaining the State's objection to respondent's own argument that

the jury did not know anything about the Illinois Sex Offender Program and whether it is underfunded.

¶ 74    We see no error in the State urging the jury to send a message to respondent personally with its verdict, as this court has sanctioned similar remarks in closing. See *People v. Desantiago*, 365 Ill. App. 3d 855, 865 (2006) (no prosecutorial misconduct because the State encouraged the jury to send a message to the defendant personally, and not the community or other defendants); *but cf. People v. Johnson*, 208 Ill. 2d 53, 78 (2003) (prosecutors may not urge jury to use its verdict to " 'send a message' " to the community at large or about crime in general, as such remarks interject "matters that have no real bearing upon the case at hand").

¶ 75    Nor do we find the State improperly referenced respondent not receiving treatment, as the remarks were based on the evidence at trial, *i.e.*, the testimony of both parties' experts that respondent did not receive treatment, which was shown to decrease the risk of reoffending. The State's remarks regarding the lack of seeking treatment also bolstered the State's larger argument that respondent still had a mental disorder and was thus still an SVP. Respondent's remarks about the funding of the Illinois Sex Offender Program, on the other hand, were not based on any evidence admitted at trial. The court properly allowed remarks in closing that were based on evidence at trial, and did not allow respondent's remark about a specific program's funding, which was not based on any evidence. See *McAndrew*, 2024 IL App (1st) 230881, ¶ 58 (closing arguments may reference evidence presented).

¶ 76    Respondent also argues that the State misstated the evidence and law in rebuttal by stating that "all three experts agree" that respondent had a personality disorder that is a "mental disorder

under the Act." Viewing this remark in context, however, we find no misstatement of evidence or law.

¶ 77    In rebuttal, the State summarized Dr. Rosell's testimony, remarking that Dr. Rosell "saw the same pattern" as Drs. Tsoflias and Smith. Unlike the State's experts, however, Dr. Rosell found it was not a paraphilic disorder but a personality disorder, and Dr. Rosell stated respondent "doesn't just want to rape, he just wants to commit crimes in general." The State commented that if respondent "has that mental disorder, which all three experts agree on, that is a mental disorder." The State then elaborated that it is a "mental disorder under the Act when it controls his behavior, when it predisposes him to engage in these acts of sexual violence."

¶ 78    Viewing the remark at issue in context, the State was accurately stating the law and evidence. See *Jackson*, 2020 IL 124112, ¶ 82. Specifically, the State noted that all three experts diagnosed respondent with os-personality disorder (antisocial). The State then added a reasonable inference that this diagnosed condition would qualify as a mental disorder under the Act if it predisposed respondent to engage in acts of sexual violence, *i.e.*, if the condition matched the definition of "mental disorder" under the Act. See 725 ILCS 207/5(b) (West 2016). The prosecutor was allowed to argue reasonable inferences drawn from the evidence presented at trial. See *McAndrew*, 2024 IL App (1st) 230881, ¶ 58. We therefore find the remark proper.

¶ 79    Respondent also argues the State improperly deployed "unacceptable mockery and sarcasm" when making the following comment in rebuttal:

"Now, counsel spent a lot of time talking about how Dr. Tsoflias and Dr. Smith relied on these other charged crimes that didn't result in convictions. No one's claiming they

resulted in convictions, but they would have you believe that he is the most unlucky man on the face of this earth."

¶ 80    We find no error here. This court has reiterated multiple times that "the use of mild sarcasm or invective is not misconduct," and "reviewing courts do not act as the 'speech police' in reviewing closing arguments." See *People v. Potts*, 2021 IL App (1st) 161219, ¶ 291. We cannot find that these isolated remarks, which at most convey mild sarcasm, rise to a level that would constitute misconduct. *Cf. Gavin*, 2014 IL App (1st) 122918, ¶¶ 31, 62, 66 (finding the prosecutor's "extreme level of sarcasm" constituted misconduct where the prosecutor "continuously mock[ed]" the respondent by, among other things, referencing the respondent having one testicle and stating " '[w]ell, oh, my gosh, I'm glad no one told Lance Armstrong that you can't ever accomplish your goals, and in his case his goals are raping people," and asking the jury, "isn't [defendant] old," before comparing his age to that of several celebrities).

¶ 81    We also see no indication that the State argued that the bases of its experts' opinions were actual evidence, as respondent asserts. Relevant here, respondent argued that the testimony regarding his criminal history was not "proof of what happened," but the State's experts "believed that those events are actually true" and the State wanted the jury to believe the behaviors actually occurred. Respondent also raised that many of the alleged sexual offenses did not result in convictions.

¶ 82    In rebuttal, the State argued that the "case comes down to *** risk," and respondent "spent a lot of time saying *** he hasn't done anything while in prison" or while in the TDF "in the past 13 years." The State then observed that doctors reviewed his disciplinary records. It noted that respondent did not commit any sexual offenses in prison in 1998, but "what happened when he got

back into the community? How about in 2004 or 2002, he's sentenced again, six years. Did you hear anything about him committing a rape then? What happened next? He's released into the community and he does it again." The State told the jury that respondent's risk factors were evaluated through a pure actuarial approach but, "most importantly," "[o]ur commonsense says he's going to do it again." The State then recounted respondent's pattern of being convicted for sexually violent offenses after being released from prison.

¶ 83    Again, we view closing arguments as a whole, and not isolated phrases or remarks. *Jackson*, 2020 IL 124112, ¶ 82. Our review of the record shows that these remarks were made in the context of discussing the State's experts' observations of respondent's reoffense risk. We cannot find any error occurred, as the State was properly remarking on the pattern of behavior observed by its experts in diagnosing respondent's mental disorders. See *McAndrew*, 2024 IL App (1st) 230881, ¶ 58 (prosecutor may comment on evidence admitted); see also *White*, 2016 IL App (1st) 151187, ¶ 59 (experts are not prohibited from relying on the underlying behaviors manifested during prior offenses in the diagnosis of a particular mental disorder).

¶ 84    Because we have found no error occurred in the State's closing and rebuttal arguments, we must also find no plain error as to the unpreserved claims of prosecutorial misconduct in closing. See *People v. Colone*, 2024 IL App (1st) 230520, ¶ 132.

¶ 85                           D. Jury Instructions

¶ 86    Respondent further asserts that the trial court committed multiple errors when instructing the jury. "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). A jury instruction "must state

the law fairly and distinctly and must not mislead the jury or prejudice a party." (Emphasis and internal quotation marks omitted.) *Conxall Corp. v. Iconn Systems, LLC*, 2016 IL App (1st) 140158, ¶ 19. To that end, pattern instructions are presumed to be accurate statements of Illinois law, and the jury is to be instructed using an approved pattern if the trial court determines that it applies to the circumstances of the case. *Hana v. Illinois State Medical Inter-Insurance Exchange Mutual Insurance Co.*, 2018 IL App (1st) 162166, ¶ 36. "The Illinois pattern jury instructions 'have been painstakingly drafted,' and trial courts 'should not take it upon themselves to second-guess the drafting committee where the instruction in question clearly applies.' " *People v. Smith*, 2017 IL App (1st) 143728, ¶ 97 (quoting *People v. Durr*, 215 Ill. 2d 283, 301 (2005)). A trial court may give a nonpattern instruction when it determines the IPI Civil instruction on point does not accurately state the law. *North League of Professional Baseball Teams v. Gozdecki, Del Giudice, Americus & Farkas, LLP*, 2018 IL App (1st) 172407, ¶ 70; Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013). A nonpattern instruction should be "simple, brief, impartial, and free from argument." *Id.*

¶ 87    Here, respondent's claims of error center on the trial court's decisions regarding the proposed nonpattern instructions.

¶ 88    It is within the discretion of the trial court to give a nonpattern instruction. *Parikh v. Gilchrist*, 2017 IL App (1st) 160532, ¶ 33. The court abuses the discretion in giving a nonpattern instruction where, "taken as a whole, it does not fairly, fully, and comprehensively apprise the jury of the relevant legal principles." *Northern League of Professional Baseball Teams*, 2018 IL App (1st) 172407, ¶ 70. We will not reverse a trial court for giving faulty instructions unless they "clearly misled the jury and resulted in prejudice to the appellant." *Lange v. Freund*, 367 Ill. App. 3d 641, 645 (2006).

¶ 89                              1. IPI Civil (2016) No. 2.04

¶ 90    Turning to respondent's first claim, that the trial court erred in giving IPI Civil (2016) No. 2.04 and not his proposed nonpattern instructions, we find no reason to part from the presumption that IPI Civil (2016) No. 2.04 is an accurate statement of Illinois law. See *Hana*, 2018 IL App (1st) 162166, ¶ 36. The instruction provides:

> "I am allowing the witness to testify in part to [books] [records] [articles] [statements] that have not been admitted in evidence. This testimony is allowed for a limited purpose. It is allowed so that the witness may tell you what he/she relied on to form his/her opinion[s]. The material being referred to is not evidence in this case and may not be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, you will give the opinions testified to by this witness." IPI Civil (2016) No. 2.04.

¶ 91    IPI Civil (2016) No. 2.04 is based on a "well-settled" rule that "an expert may give opinion testimony that relies on facts and data not in evidence, as long as the underlying information is of the type reasonably relied on by experts in the particular field." *In re Commitment of Tenorio*, 2020 IL App (1st) 182608, ¶ 43; see also IPI Civil (2016) No. 2.04 Notes on Use (instruction "should be given when the facts or data underlying an expert's opinion have been revealed to the jury but are not admissible in evidence"). While an uninformed jury may misuse this type of information as substantive proof, a limiting instruction "advising the jury to consider the underlying statements only to evaluate the basis of the expert's opinion" should prevent such misuse. *People v. Anderson*, 113 Ill. 2d 1, 12 (1986).

¶ 92    We find that IPI Civil (2016) No. 2.04 adequately and accurately reflects Illinois law on this subject, as it provides that facts not admitted in evidence but revealed as the basis for an expert's opinion may only be considered for the limited purpose of deciding the weight to give that opinion. See *Tenorio*, 2020 IL App (1st) 182608, ¶ 43; see also *In re Commitment of Jackson*, 2023 IL App (1st) 221303-U, ¶ 100 ("IPI 2.04 correctly states the law applicable to a consideration of basis of opinion of expert testimony").[1] As such, we cannot find that the trial court abused its discretion in giving the applicable IPI Civil instruction, as it was required to do. See Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013) ("the IPI instruction *shall* be used, unless the court determines that it does not accurately state the law" (emphasis added)).

¶ 93    Nonetheless, respondent claims the circuit court should have given his proposed nonpattern Jury Instructions 12A and 12B, modeled after WPI 365.03, instead of IPI Civil (2016) No. 2.04. He contends that IPI Civil (2016) No. 2.04 fails to expressly state that the jury cannot consider the factual bases of an expert opinion as evidence that it "is true or that the events described actually occurred." Yet this distinction was not necessary, where IPI Civil (2016) No. 2.04 explained that the information in question was only allowed for a "limited purpose" to inform the jury of the bases of the experts' opinions to determine the appropriate weight to give the opinions. We presume that the jury followed the limiting instruction, as there is no evidence to the contrary. See *People v. Polk*, 2024 IL App (1st) 181933, ¶ 263.

¶ 94    Given that IPI Civil (2016) No. 2.04 clearly applied, the trial court correctly declined to second-guess the drafting committee and offer a nonpattern instruction that contains only a slight

---

[1] Cited as persuasive authority under Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered under Rule 23(b) on or after January 1, 2021, may be cited for persuasive purposes).

difference in word choice. See *Smith*, 2017 IL App (1st) 143728, ¶ 97. We therefore find that the trial court did not abuse its discretion when instructing the jury based on IPI Civil (2016) No. 2.04.

¶ 95                    2. Instructions Regarding General Acceptance

¶ 96    Respondent also argues that the trial court erred in giving the State's nonpattern Jury Instruction 13 and in rejecting his proposed nonpattern Jury Instructions 20A, 20B, and 21A.

¶ 97    The State's Jury Instruction 13 provided, "The diagnosis of Other Specified Paraphilic Disorder (nonconsenting) is generally accepted in the psychological and psychiatric community." This was an accurate statement of law, as "[t]his court has consistently found *** that [os-paraphilic disorder (nonconsent)] is generally accepted in the psychiatric and psychological communities." *Butler*, 2022 IL App (1st) 201107, ¶ 34; see also *Adams*, 2021 IL App (1st) 182049, ¶ 56. We therefore cannot conclude the trial court abused its discretion in giving Jury Instruction 13, which accurately stated Illinois law's recognition of os-paraphilic disorder (nonconsent) as a generally accepted diagnosis. See *Northern League of Professional Baseball Teams*, 2018 IL App (1st) 172407, ¶ 70.

¶ 98    Nonetheless, respondent claims that the State's Jury Instruction 13 did not accurately state the law and was confusing because it did not define "general acceptance" and did not clarify that the term "equates to nothing more than the admissibility of a scientific methodology." He asserts that the instruction was prejudicial because it improperly bolstered the credibility of the State's experts regarding their diagnoses. This concern, however, was specifically addressed when the trial court gave respondent's proposed nonpattern Jury Instruction 21B, instructing the jury that "[a]lthough a particular technique or methodology may be generally accepted in the scientific community, you may decide whether to accept an expert's conclusion that is based on that

technique or methodology." This instruction sufficiently informed the jury that, while os-paraphilic disorder (nonconsent) may be a generally accepted diagnosis, it was still the jury's role to decide whether Drs. Tsoflias and Smith properly gave respondent that diagnosis.

¶ 99     Respondent also argues the trial court should have also given his proposed Jury Instruction 21A, which was nearly identical to Instruction 21B, but added one sentence: "You are not required to accept an expert's conclusion because the technique or methodology they used is generally accepted." Yet the jury was already instructed that it "may decide" whether to accept an expert's conclusion that is based on a generally accepted technique or methodology. Additionally instructing the jury that they were not required to accept the conclusion was unnecessary. See Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013) (nonpattern instruction should be "simple, brief, impartial, and free from argument").

¶ 100   Additionally, respondent asserts that the trial court erred in rejecting his nonpattern Jury Instructions 20A and 20B. Jury Instructions 20A and 20B both provided that " 'General acceptance' does not mean universal acceptance, and it does not require that the methodology in question be accepted by unanimity, consensus, or even a majority of experts." Jury Instruction 20A added, "Instead, it is sufficient that the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the relevant field." These instructions, however, likely would have misled the jury, implying that os-paraphilic disorder was not a valid diagnosis, a contention that this court has "expressly rejected." See *Butler*, 2022 IL App (1st) 201107, ¶ 34. The trial court thus properly declined to give nonpattern instructions that would have misled the jury in that regard. See *Conxall Corp.*, 2016 IL App (1st) 140158, ¶ 19 (instruction must state the law fairly and distinctly and must not mislead the jury).

¶ 101   The trial court did not abuse its discretion in instructing the jury that os-paraphilic disorder was a generally accepted diagnosis, and in rejecting some of respondent's instructions about general acceptance.

¶ 102                    3. Instruction on Prior Sexually Violent Offenses

¶ 103   Respondent also asserts that the trial court improperly rejected his proposed Jury Instruction 9, which stated, "Evidence that the Respondent was convicted for or committed sexually violent offenses before committing the offense or act on which the petition is based is not sufficient to establish beyond a reasonable doubt that the person has a mental disorder."

¶ 104   The parties do not dispute that Jury Instruction 9 is an accurate statement of the law, as it accurately conveys the language of section 35(e) of the Act (725 ILCS 207/35(e) (West 2016)), which states, "Evidence that the person who is the subject of a petition under Section 15 of this Act was convicted for or committed sexually violent offenses before committing the offense or act on which the petition is based is not sufficient to establish beyond a reasonable doubt that the person has a mental disorder." *Id.* We agree with the State, however, that respondent's proposed instruction would have misled the jury and caused unnecessary confusion as to the weight to be given prior sexually violent offenses.

¶ 105   As previously stated, an expert may rely on the behaviors exhibited during a respondent's prior offenses in diagnosing a mental disorder. *White*, 2016 IL App (1st) 151187, ¶ 59. That expert's diagnosis may also be based on a respondent's sexual or nonsexual behavioral history, even if it did not result in a conviction. *Moore*, 2023 IL App (5th) 170453, ¶ 85. Section 35(b) of the Act further provides that the State may introduce at trial evidence of the crimes respondent committed and the accompanying punishment. 725 ILCS 207/35(b) (West 2016).

¶ 106    Where, as here, the State relied on evidence of respondent's criminal convictions, sexual behaviors, antisocial behaviors, and disciplinary infractions, Jury Instruction 9, which was premised on section 35(e) of the Act, was unnecessary. The instruction also would have risked confusing the jury, as it would have suggested that respondent's prior offenses did not carry weight in demonstrating respondent had a mental disorder. We therefore find no abuse of discretion occurred when the trial court denied this instruction. See *In re Commitment of LaRue*, 2021 IL App (1st) 200858-U, ¶¶ 64-65, 70-72 (trial court properly denied instruction based on 35(b) where the instruction had the potential to confuse the jurors because the State did not solely rely on respondent's prior sex offenses).[2]

¶ 107                                    E. Cumulative Error

¶ 108    Having found no error, we need not consider respondent's argument that the cumulative effect of his claims of error require reversal. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 120.

¶ 109                                    III. Conclusion

¶ 110    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 111    Affirmed.

---

[2] Cited as persuasive authority under Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023).